**UNITED GAS PIPE LINE CO., Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent.**

No. 86–4424.

United States Court of Appeals, Fifth Circuit.

Aug. 18, 1987.

followed."

Peter J. Levin, Pierson, Semmes & Finley, W. DeVier Pierson, Washington, D.C., George Frazier, C. Murphy Moss, Jr., New Orleans, La., John R. Hutcherson, Brunini, Grantham, Gower & Hewes, Jackson, Miss., for United Gas Pipe Line Co.

Joel M. Cockrell, Jerome M. Feit, Sol. F.E.R.C., Washington, D.C., for F.E.R.C.

James R. Lacey, Gen. Sol., Newark, N.J., for Public Service Elec. & Gas Co.

Clayton L. Orn, Houston, Tex., Joseph P. Wise, Jackson, Miss., for New Orleans Public Service Inc. and Mississippi Power & Light Co.

Wayne J. Lee, Michael R. Fontham, New Orleans, La., for Louisiana Public Service Comn.

Margaret Fabic, Brooklyn, N.Y., Alvin Adelman, for Brooklyn Union Gas Co. and Elizabethtown Gas Co.

Andrew P. Carter, New Orleans, La., Terrence O'Brien, for Louisiana Power & Light Co.

Stephen M. Hackerman, Houston, Tex., for Pennzoil Co.

John F. Harrington, Washington, D.C., for Texas Gas Transmission Corp.

Constance Charles Willems, New Orleans, La., Ellis Baker Murov, for City of New Orleans.

Donna J. Bailey, Birmingham, Ala., for Southern Natural Gas Co.

Before THORNBERRY, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Once again we review a facet of the administrative proceedings, begun sixteen years ago before the Federal Power Commission, involving United Gas Pipe Line Company's curtailment of natural gas to its customers during the nation-wide natural gas shortages of the 1970's. We review Opinions Nos. 237 and 237–A, in which the Federal Energy Regulatory Commission approved tariffs stating that United is not liable for contract damages arising from deliveries of natural gas curtailed in compliance with a filed curtailment plan unless United, through negligence, bad faith, fault, or willful misconduct, caused the need for curtailments. United seeks greater protection from liability by a standard greater than negligence and would also have us require the Commission to determine whether United in fact was culpable. Several intervenors challenge the Commission's jurisdiction to approve the tariffs for direct sales customers and challenge whether the tariffs are in the public interest. We vacate the portion of the Commission's orders determining that force majeure did not apply on the facts, then conclude that the remainder of the decisions are reasonable exercises of Commission power and are supported by substantial evidence, and affirm.

## I. HISTORY

The petitioner, United Gas Pipe Line Co., is among the largest of the nation's interstate natural gas pipeline companies that sell natural gas in direct sales and in sales for resale. United owns and operates a pipeline system that extends throughout Texas, Louisiana, Mississippi, Alabama and Florida. Its major pipeline customers distribute natural gas throughout the eastern half of the United States. United also sells gas to industries, power plants, and local distribution systems.

Six intervenors, New Orleans Public Services, Inc., Mississippi Power & Light Co., City of New Orleans, Louisiana Power & Light Co., Brooklyn Union Gas Co., and Elizabethtown Gas Co., are direct sales customers of United. The seventh intervenor, the Louisiana Public Service Commission, is a state public regulatory body with statutory authority to regulate public utilities in Louisiana and to assert the interests of Louisiana's consumers of electricity.

In 1952, during temporary natural gas shortages caused by the Korean War, the Federal Power Commission approved United's tariff section 12.1, which stated, "In the event a shortage of gas renders Seller unable to supply the full gas requirements of all of its consumers, then, Seller, may, without liability to Buyer prorate its gas supply in the manner hereinafter 'set forth...."

Around 1970, the nation experienced severe shortages of natural gas. United lacked sufficient supplies to meet its customers' needs for the winter of 1970–71 and proposed to curtail deliveries according to the priorities in its 1952 tariff. On October 26, 1970, United sought an order from the FPC declaring that United's curtailment plan complied with its tariffs and that, given section 12.1, United incurred no liability for curtailments to any customer, including direct sales customers. *See United Gas Pipe Line Co.*, FPC Docket No. RP71–29. After two days of hearings on the order, United reached an agreement with its customers, except Monsanto Co., permitting curtailments through March 31, 1971.[1]

In February 1971, United made a supplemental filing for a curtailment plan

---

1. Monsanto petitioned for review of the agreement to the District of Columbia Circuit. It also sued United in the District Court for the District of Columbia, seeking damages for breach of contract and also injunctive relief. *See Monsan-to Co. v. FPC*, 463 F.2d 799, 803 (D.C.Cir.1972). The D.C. Circuit dismissed Monsanto's petition to review, but held that the district court had jurisdiction over the contract action. *Id.* at 805, 808.

through October 31, 1971. In March, Louisiana Power & Light Co. sued United, alleging that the curtailment breached its contract with United and challenging FPC jurisdiction to curtail gas to direct sales customers. The district court dismissed the suit, holding that the FPC had jurisdiction of both curtailment and certification proceedings for direct sales and that Louisiana Power & Light Co. had to exhaust its administrative remedies in both. *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 332 F.Supp. 692, 698 (W.D. La.1971). We reversed, holding that the FPC lacked authority to curtail gas to direct sales customers. *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 456 F.2d 326, 333–38 (5th Cir.1972). The Supreme Court in turn reversed, holding that the FPC under its power to regulate transportation can order curtailment plans involving both direct sales and sales for resale. *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 647, 92 S.Ct. 1827, 1842, 32 L.Ed.2d 369 (1972).

With the winter of 1970–71, other pipelines experienced shortages. Responding to a growing fuel crisis, the FPC on April 15, 1971, by Order No. 431, required all interstate pipelines either to file new tariffs containing end-use curtailment[2] plans or to establish that existing curtailment tariffs conformed to FPC policy. The FPC asserted that the tariffs would control over inconsistent provisions in all sales contracts, jurisdictional and nonjurisdictional. Order No. 431, 18 C.F.R. § 270 (1971).

*Opinions Nos. 606 & 606–A*

On May 17, 1971, in response to Order No. 431, United proposed a five-category, end-use curtailment plan to replace the plan it already had. Second, United proposed to modify tariff section 12.1 to make clear that it could curtail both direct sales and sales for resale without liability. United also proposed a new tariff section 12.3 intended to eliminate United's potential liability under a substitute fuels provision[3] in some of its direct sales contracts.[4] Finally, United requested the FPC to construe narrowly the substitute fuel clauses.

In Opinion No. 606, 46 FPC 786 (1971), the FPC granted interim approval to proposed section 12.1 with one change in its curtailment priorities, effective November 14, 1971. A Hearing Examiner was ordered to assess the justness and reasonableness of the curtailment scheme before final approval. The FPC rejected proposed tariff 12.3 and declined to interpret the substitute fuel clauses, reasoning those actions were unnecessary because "[i]mplementation of the curtailment plan itself, pursuant to our procedures, would be an absolute defense for United against all claims for specific performance, damages, or other requests for relief ... that may be initiated in the courts." 46 FPC at 805. United's customers objected to this language and sought rehearing.

---

**2.** In end-use curtailment, the Commission determines that certain uses of gas (e.g., use by residential customers) have a higher priority than other uses (e.g., use as boiler fuel or industrial uses). In a shortage, customers purchasing gas for inferior uses will have gas deliveries curtailed before any service to higher-priority customers is curtailed. *See American Smelting & Refining Co. v. FPC*, 494 F.2d 925, 935 (D.C. Cir.1974).

**3.** One substitute fuels provision reads:
If so requested by Seller at any time and from time to time, Buyer agrees that it will use Number 2 grade fuel oil purchased and supplied by Buyer, as above set forth, in lieu of gas for Buyer's fuel requirements hereunder during the period or periods of time so requested by Seller. In the event Seller is excused by reason of force majeure or proration of impaired deliveries from delivering gas to Buyer for Buyer's fuel requirements hereunder, up to the Maximum Daily Delivery Obligation then in effect, and Buyer uses Number 2 grade fuel oil for its fuel requirements, even though not so requested to do by Seller, during the period Seller is so excused from delivering gas hereunder, all such fuel oil so used by Buyer during any period of not more than seven consecutive days shall be deemed to have been used by Buyer at Seller's request.
Exhibit 23, Gas Sales Agreement Between Mississippi Power & Light Co. and United Gas Pipe Line Co., art. XVI (July 31, 1965).

**4.** The proposed tariff section 12.3 stated, "[N]or shall seller be obligated to pay or credit such customers any sums with respect to substitute fuels burned by such customers during such a period of proration or interruption."

The FPC denied rehearing in Opinion No. 606–A, 46 FPC 1290 (1971), explaining, "[T]he pipeline companies cannot be faced with the dilemma of providing nondiscriminatory service as ordered by the Commission and at the same time incur liability for breach of contracts which grant discriminatory preferences, directly or indirectly." *Id.* at 1293.

In *International Paper Co. v. FPC*, 476 F.2d 121 (5th Cir.1973), we reviewed Opinions Nos. 606 and 606–A and rejected the FPC's conclusion that implementation of a curtailment plan is an absolute defense against contract claims, saying the conclusion was "mere dicta and has no force other than to reflect a position taken by the FPC which lacks support in the record before it." *Id.* at 125. We also suggested "that a court which has the actual damage suit before it, and also the final FPC action, is best suited to determine the applicability of a defense recognized in contract law." *Id.* at 126 (footnote omitted). We then remanded for the FPC to state clearly its justification for its rule and to develop the necessary record to provide meaningful review. *Id.* at 129.

In a concurring opinion that greatly influenced the Commission's later rulings, Judge Brown observed that a pipeline's immunity from liability for curtailments in compliance with a federal plan is not based solely on the defense of impossibility because of an intervening government order, but is based on federal preemption. *Id.* at 131. Judge Brown suggested that a pipeline should not be liable for its compliance with a federal curtailment plan, for such liability "would seriously impair the orderly administration of the regulatory scheme." *Id.* However, were the customers to establish that the need for curtailment was "precipitated by the pipeline's own failure to heed the signs of an impending crisis," then the analysis *"might"* be different enough to warrant imposing liability on the pipeline. *Id.* at 131–32.

*Opinions Nos. 647 and 647–A*

In July 1972, the Presiding Examiner made findings on the justness and reasonableness of United's curtailment plan, as Opinion No. 606 directed. In January 1973, before *International Paper Co.*, the FPC reviewed the Presiding Examiner's decision, approved some interim and permanent changes in the curtailment priorities in section 12.1, restated its view that United could not be liable for curtailments complying with a federal plan, and ordered United to delete section 12.3 as unnecessary. Opinion No. 647, 49 FPC 179, 193 (1973).

After the decision in *International Paper Co.*, the FPC reheard Opinion No. 647 and attempted to clarify its views in accordance with our recent decision. Opinion No. 647–A, 49 FPC 1211 (1973). The FPC determined that a pipeline curtailing gas in compliance with a filed curtailment plan must be exonerated from liability unless it caused the shortages through negligence, bad faith, or other wrongful conduct. The FPC agreed that it could not adjudicate contract liability, but affirmed its finding in Opinion No. 647 that United was not guilty of improvidence or willful misconduct. 49 FPC at 1220–21. The FPC held the substitute fuel clauses were not against the public interest, but expressly conditioned that holding on its interpretation that the clauses imposed liability on United for seven days only. *Id.* at 1221–22. Finally, the FPC determined that proposed section 12.3 was unnecessary. *Id.* at 1224.

In *Louisiana v. FPC*, 503 F.2d 844 (5th Cir.1974), we reviewed Opinions Nos. 647 and 647–A and again vacated and remanded the FPC's conclusions about contract liability and related tariff issues. We noted that the FPC rejected proposed section 12.3 because it determined that United was not exposed to contract liability for curtailments unless United was negligent or otherwise culpable, that United was not improvident in fact and therefore was not liable, and that the substitute fuel clauses in any event imposed liability for only seven days. We held that the proper questions were whether the proposed provision could remove general contract liability and whether the removal of liability subjected United's customers to "any undue prejudice or disadvantage." *Id.* at 867. We concluded that, because "the Commission

cannot adjudicate contract liability, it should evaluate section 12.3 on the assumption that United faces possible liability—not on the assumption it is immune." *Id.* at 867–68. We also held the FPC's interpretation limiting to seven days United's liability under the substitute fuel clauses to be "without force and effect" for lack of adequate supporting reasons. *Id.* at 868.

### Opinions Nos. 237 and 237–A

On remand from *Louisiana v. FPC,* the FPC on March 7, 1975, created "Phase I" of United's curtailment proceedings to establish an interim curtailment plan, while "Phase II" developed a permanent curtailment plan and considered the issues relating to United's liability and to the proposed tariff sections. Meanwhile, United resubmitted to the FPC proposed section 12.3.[5] On May 2, 1975, the FPC severed the liability issues from Phase II and created "Phase III" to examine United's liability under curtailment plans on an expedited basis. 53 FPC 1496, 1500 (1975). Only Phase III is involved in this petition for review. On August 20, 1975, the FPC enlarged Phase III to consider whether section 12.1 of United's tariff precludes damage claims.[6] 54 FPC 796, 799 (1975).

On August 30, 1974, Mississippi Power & Light Co. sued United and Pennzoil, Unit-

ed's former parent, for breach-of-contract damages totaling $160,000,000.00. The district court stayed the suit pending the FPC's exercise of primary jurisdiction. We affirmed, indicating five components of the suit in which the FPC's assistance could be significant, including determination of the facts and circumstances that caused the shortage. *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 420 (5th Cir.1976).[7]

On August 9, 1978, the Federal Energy Regulatory Commission[8] issued an order identifying seven issues to comprise the scope of Phase III:

1. Is it within the Commission's jurisdiction and authority under the Natural Gas Act to approve proposed section 12.3 as a part of United's curtailment tariff?

2. If the answer to question 1 is "yes," should Section 12.3 be approved?

3. If so, what should be the effective date of such provision?

4. What would be the effect of Section 12.3 upon United's potential contract liability? Specifically, would approval of Section 12.3 effectively abrogate the substitute fuel clauses contained in the contract between United and certain of its customers?

5. Redesignated in the application as section 12.-4. We will continue to refer to the provision as section 12.3 to avoid confusion.

6. Meanwhile, Mississippi Public Service Commission petitioned the FPC for extraordinary relief on behalf of Mississippi Power & Light Co. and other Mississippi utilities, seeking compensation from the customers receiving a higher preference in United's curtailment plan in order to allocate the financial burden of curtailment among all customers. The Commission denied the petition for lack of jurisdiction to order compensation. We reversed and remanded for the Commission to consider the proposal. *See Mississippi Public Service Comm'n v. FPC,* 522 F.2d 1345, 1350–51 (5th Cir.1975), *cert. denied,* 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976).

7. Between 1971 and 1975, several of United's direct sales customers brought suit against United in various state and federal courts, seeking to recover damages amounting to $1,973,820,-622.00, which they claimed to suffer as a result of United's curtailments. United settled with Gulf States Utilities Co., which claimed over

$700 million in damages, for $112 million. On August 24, 1984, the City of New Orleans and New Orleans Public Service, Inc., obtained judgment in state court against United for $44,403,-106.00, and Louisiana Power & Light Co. obtained judgment for $40,309,142.00. *See City of New Orleans v. United Gas Pipe Line Co.,* Nos. 575–544, 579–040 (Civ.D.Ct.Parish of Orleans, La. Aug. 24, 1984). The Louisiana Court of Appeals recently affirmed both judgments, increasing the recovery of the City of New Orleans and NOPSI to $46,410,925.00 and increasing the recovery of Louisiana Power & Light Co. to $90,014,543.00. *See City of New Orleans v. United Gas Pipe Line Co.,* Nos. 3613–3614 (La.Ct.App. Apr. 30, 1987).

8. On August 4, 1977, Congress enacted the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (1977), which created the Federal Energy Regulatory Commission and transferred to it the functions of the Federal Power Commission. *See* 42 U.S.C. §§ 7171–7172.

5. If so, would this serve to grant any undue preference or advantage to any person or subject any person to undue prejudice or disadvantage within the meaning of section 4(b)(1) of the Natural Gas Act?

6. Do any other of United's tariff provisions or any general or specific orders of the Commission remove or limit United's potential contract liability?

7. Would the awarding of damages for United's curtailments grant the recipients thereof an undue preference or advantage in contravention of the Natural Gas Act?

4 FERC ¶ 61,151, at 61,355 (1978). No party sought rehearing or clarification of this order.

On September 14, 1982, after extensive evidentiary hearings, the Administrative Law Judge issued his Initial Decision on Phase III, 20 FERC ¶ 63,070 (1982), which the Commission for the most part affirmed on June 19, 1985, in Opinion No. 237, 31 FERC ¶ 61,336 (1985). In Opinion No. 237, the Commission affirmed the ALJ's decision not to determine whether United improvidently or negligently caused the shortage of gas, for that determination was beyond the scope of Phase III and would be conclusively determined by the courts anyway.[9]

Addressing the questions in Phase III, the Commission determined that it had authority to approve tariffs exculpating United from contract liability for curtailments to both direct sales and resale customers, provided that United did not cause the shortages through negligence or willful misconduct and that United effected the curtailments in accordance with filed curtailment plans. The Commission ordered United to refile sections 12.1 and 12.3 with modifications to reflect the Commission's standard for exculpation, and made the sections effective November 14, 1971.

The Commission held that the modified section 12.3 would remove United's liability during curtailments under the substitute fuel clauses unless United caused the shortage through negligence or willful misconduct. If United were liable, the Commission interpreted the substitute fuel clauses to mean that United would be liable only for seven days of substitute fuel costs.

The Commission further determined that no undue preference would be granted and no undue prejudice imposed by adoption of sections 12.1 and 12.3 as modified effective November 14, 1971. The Commission also held that no other tariff provisions removed or limited United's potential contract liability, specifically saying the force majeure provisions in tariff sections 11.1 and 11.2 did not apply because the shortage was not completely out of United's control: United controlled aspects of its supply and demand.

Finally, the Commission repeated its position that, even in the absence of the exculpatory clauses, damages cannot be awarded for failure to deliver without a showing of fault, for the award is preempted by the federal curtailment scheme. The Commission denied rehearing in Opinion No. 237-A, 35 FERC ¶ 61,344 (1986).

On June 17, 1986, United filed in our court a petition for review of Opinions Nos. 237 and 237-A. No other party or intervenor below filed a petition for review. However, within sixty days of Opinion 237-A and within thirty days of United's petition, the intervenors filed notices of intervention.[10] Later, some intervenors filed Docketing Statements raising several issues not in United's petition for review and Docketing Statement. The Commission moved to dismiss the intervenors' additional issues for want of jurisdiction: the intervenors had not filed petitions for review within the sixty-day period and there-

---

9. Although the ALJ made findings about the facts and circumstances surrounding curtailment when analyzing whether United's proposed tariffs must be rejected because of United's "unclean hands," the Commission did not adopt the ALJ's statements as its findings.

10. Public Service Electric & Gas Co., Pennzoil Co., and Texas Gas Transmission Co. also filed timely notices of intervention, and Southern Natural Gas Co. was granted leave to intervene out of time. None filed briefs and none is included in the term "intervenors" in the text.

fore were limited to those issues United raised. United moved to strike the portions of the intervenors' briefs dealing with the additional issues. We have carried the motions with this case.[11]

On February 7, 1987, Brooklyn Union Gas Co. and Elizabethtown Gas Co. moved for leave to file a joint reply brief. The Commission and United opposed the motion because the two intervenors did not petition for rehearing of Order No. 237 and thus do not meet the jurisdictional requirements for review. The motion has been carried with the case.

## II. FERC JURISDICTION

■ We first decide whether the Commission has jurisdiction to approve an exculpatory tariff applicable to direct sales customers. The Natural Gas Act, § 1(b), 15 U.S.C. § 717(b), provides:

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

In *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972), the Supreme Court interpreted this statute to grant the FPC transportation authority over direct sales while withholding only rate-setting authority. *Id.* at 638, 92 S.Ct. at 1837. The Court stated that "[c]urtailment regulations are not *rate-set-*

*ting* regulations but regulations of the 'transportation' of natural gas and thus within FPC jurisdiction." *Id.* The Supreme Court further observed that Congress, in section 16 of the Natural Gas Act,[12] intended a generous construction of the Commission's statutory authority to deal with its jurisdictional responsibilities. *Id.* at 642, 92 S.Ct. at 1839.

The dispositive jurisdictional question, then, is whether the exculpatory tariffs are rate-setting regulations that may not be applied to direct sales customers, or whether the tariffs are transportation regulations that may be applied to direct sales customers. In *Louisiana v. FPC*, 503 F.2d 844, 867 (5th Cir.1974), we resolved that question by explaining that "the proposed exculpatory provision [section 12.3] was part and parcel of United's proposed curtailment plan."[13] Because exculpatory clauses are "an integral part of a proposed curtailment plan," *id.*, because curtailment plans are within the Commission's transportation jurisdiction, and because the Commission has jurisdiction over direct sales in regulating transportation, it must follow that the Commission has jurisdiction to approve exculpatory clauses for curtailments to direct sales customers. *See Mississippi Public Service Commission v. FPC*, 522 F.2d 1345, 1350 (5th Cir.1975), *cert. denied*, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976) (a proposed plan for high priority users to compensate low priority users during curtailment is part of a curtailment plan within the Commission's transportation jurisdiction).

## III. UNITED'S OBJECTIONS

United, recognizing that the Commission's decision leaves it exposed to liability for curtailments, seeks greater protection

---

**11.** United, in its Brief in Partial Support of Respondent, also moves that portions of the briefs of City of New Orleans and the Louisiana Public Service Commission be stricken or ignored for failing to provide page references to the record for factual assertions, as Fed.R. App.P. 28 requires.

**12.** Section 16 provides:
The Commission shall have power to perform any and all acts, and to prescribe, issue,

make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this Act....
15 U.S.C. § 717*o*.

**13.** Our discussion of the federal interest later in this opinion explains why exculpatory clauses are necessary and integral to curtailment plans.

from liability in its petition for review.[14] Allegedly concerned about the multiplicity of judicial standards to determine fault, United argues that the Commission should have formulated a uniform federal standard to determine United's fault in causing the shortages and argues that the uniform standard should be bad faith or willful misconduct, not negligence. United would also require the Commission to determine whether United negligently caused the shortages. To avoid liability for curtailments to direct sale customers for the 1970-71 winter heating season, United asserts that the exculpation provision of section 12.1 applied to direct sales since 1952 instead of only since November 14, 1971. Finally, United asserts that the Commission lacked substantial evidence and reasoned analysis in determining that no other tariff provisions—specifically, the force majeure clause—remove or limit United's potential contract liability for curtailments.

We note that "the Commission enjoys substantial discretion in balancing the competing interests involved in natural gas pipeline regulation." *Mississippi River Transmission Corp. v. FERC*, 759 F.2d 945, 952 (D.C.Cir.1985). Thus, "[j]udicial scrutiny under the Natural Gas Act is limited to assuring that the Commission's decisionmaking is reasoned, principled, and based upon the record." *Columbia Gas Transmission Corp. v. FERC*, 628 F.2d 578, 593 (D.C.Cir.1979). "The Commission's findings of fact are conclusive if supported by substantial evidence." *Tennessee Gas Pipeline Co. v. FERC*, 809 F.2d 1138, 1143 (5th Cir.1987). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966).

### A. Uniform Federal Standard

United argues that the Commission should have articulated a uniform federal standard of culpability because the lack of a uniform standard creates undue prefer-ences for the customers obtaining damages under state standards that are more lenient than those applied to other customers in other states. United notes that the requirement of culpability to recover for curtailment damages is a federal overlay on state contract law; no common law rules of culpability exist for this complex setting. United would have the Commission allow damages only when a customer proves United's bad faith or willful misconduct, although United would accept a negligence standard if the Commission itself adjudicates whether United was negligent.

United, then, fears application by courts and juries of Commission standards. While United's argument is expressed as a quest for a uniform federal standard to avoid undue prejudice or preference to anyone, its objective is plainly a uniform requirement of greater culpability to avoid judgments against it. United's arguments are not persuasive.

### 1. *The Need for a Uniform Standard*

To determine whether the Commission should have stated a uniform federal standard of culpability, we find it useful—but not mandatory—to draw upon the test for applying federal common law in place of state law: the comprehensiveness of the federal regulation, the federal interest in the regulated subject matter, and the need for uniform results. *Pennzoil Co. v. FERC*, 645 F.2d 360, 385 (5th Cir.1981) (footnote omitted), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 1000, 71 L.Ed.2d 293 (1982). First, the federal regulations are not comprehensive. Although the Natural Gas Act and the Natural Gas Policy Act regulate much of the natural gas industry, "the federal scheme of regulation ... is limited in its displacement of state regulatory authority." *Id.*

Second, the federal interest is to protect the federal curtailment scheme. Hence, the Commission determined that the public interest required the abrogation of contract liability based solely on compliance with a filed curtailment plan, but did not require

---

**14.** United does not challenge the Commission's determination that United is not liable for cur-tailed deliveries when United did not negligently cause the shortage.

exculpation when a pipeline causes the shortage by negligence or wrongful misconduct. That is, the Commission determined that the public interest required exculpation only when the basis for contract liability directly conflicts with the federal curtailment plan, but no more. The Commission's determination of the public interest is rational and adequately supported by reasons and findings.

■■■ We start with the proposition that the Commission may curtail deliveries of gas according to priorities it determines to be in the public interest, whether or not the priorities correspond to those created by contract. *See California v. Lo-Vaca Gathering Co.*, 379 U.S. 366, 369–70, 85 S.Ct. 486, 488, 13 L.Ed.2d 357 (1965) (pipelines cannot by contract avoid their public interest obligations once the Commission's jurisdiction attaches); *American Smelting & Refining Co. v. FPC*, 494 F.2d 925, 934 (D.C.Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974). Clearly, then, the Commission's curtailment scheme preempts the customers' contract right to specific performance of deliveries; otherwise, the curtailment scheme would have no effect. *Cf. National Licorice Co. v. NLRB*, 309 U.S. 350, 365, 60 S.Ct. 569, 577, 84 L.Ed. 799 (1940). As the Commission determined, a federal curtailment plan would also be frustrated were a pipeline liable for damages caused solely by its compliance with the federal curtailment scheme. *See* Initial Decision, 20 FERC ¶ 63,070, at 65,304. A damage award, like an order for specific performance, enforces the abrogated contract right to deliveries and creates incentives for the pipelines to resist a federal curtailment scheme. Consequently, curtailment plans may be reasonable without any compensation features. *See City of Willcox v. FPC*, 567 F.2d 394, 420 (D.C.Cir.1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978).

Furthermore, a damage award based on compliance with the federal curtailment scheme creates undue preferences for the customer receiving the award because the award directly, by being passed on through rate increases, or indirectly, through weakening the pipeline's financial condition, adversely affects the pipeline's other customers. *See* Opinion No. 237, 31 FERC ¶ 61,-336, at 61,770. In essence, the award also nullifies the curtailment scheme for the party receiving damages while leaving it in force for others, creating unequal enforcement of the scheme. For similar reasons, we have determined that a utility may not be required both to comply with a validly-filed tariff and to pay money damages for the utility's compliance with the tariff alleged to violate the antitrust laws. *See Carter v. American Telephone & Telegraph Co.*, 365 F.2d 486, 495–96 (5th Cir.1966). Therefore, in the words of Judge Brown, we agree with the Commission that "[i]t would be unthinking to suggest that, having curtailed in compliance with the dictates of the FPC, ... the Pipeline could thereafter be held accountable for its compliance." *International Paper Co.*, 476 F.2d at 131.

On the other hand, if compliance with a filed curtailment scheme in all cases protects a pipeline from liability, a pipeline could contract to deliver more gas than it knows it is able, relying on the federal curtailment scheme to immunize it. Thus, incentive for prudent management would be undermined. Consequently, it is not in the public interest to exculpate a pipeline from its own negligence or willful misconduct. *See Tennessee Gas Pipeline Co.*, 57 FPC 1593, 1600–01, 1603–04 (1977). We note that the Commission's determination of when exculpation serves the public interest comports with the reasoning of Judge Brown in *International Paper Co.*, 476 F.2d at 131–32, and of the D.C. Circuit in *Monsanto Co. v. FPC*, 463 F.2d 799, 808 (D.C.Cir.1972). Also, the Commission's determination accomodates the public interest in contract enforcement by narrowly limiting exculpation to that necessary to the integrity of curtailment plans.

■■■ Third, uniformity of result is needed only to protect the federal interest, that is, only to exculpate United from contract liability in all cases not based on United's fault. Uniformity of exculpation beyond

those cases is not a matter of federal concern, for liability then does not create incentives for United to resist a federal curtailment scheme. Rather, liability flows only from United's mismanagement in causing the shortage of gas, creating incentives for United to manage properly its gas supply and demand. Thus, the Commission acted correctly in approving the tariffs if the tariffs will uniformly exculpate United from liability based solely on failure to deliver contract quantities of gas.

### 2. *The Sufficiency of Uniformity*

■ United's arguments that the Commission erred in not adopting such a uniform federal standard suffer from several flaws. Most important, the Commission *has* articulated a uniform federal standard of liability: United is liable for curtailed deliveries only if it caused the need for curtailments through "negligence, bad faith, fault, or willful misconduct." This standard uniformly means that a customer must establish United's negligence or greater misconduct in causing a foreseeable shortage in order to recover damages. Although United has expressed concern that courts may read "fault" to mean a level of culpability less than negligence (such as strict liability or breach of a good faith duty), we note that "fault" is generally considered "the equivalent of negligence," *see Continental Insurance Co. v. Sabine Towing Co.,* 117 F.2d 694, 697 (5th Cir.1941), and that such definition of "fault" is the only definition consistent with the Commission's statements that a customer may recover only for United's negligence or willful misconduct. *See, e.g.,* Opinion No. 237–A, 35 FERC ¶ 61,344, at 61,791; Initial Decision, 20 FERC ¶ 63,070, at 65,304–05. Any standard of fault less than negligence is preempted by the federal standard in this setting.

United suggests that the Commission's standard is not uniform because it draws on state law as applied by juries and courts rather than by the Commission itself. Because no state common-law rules exist to define the culpability needed for contract liability once a strict breach-of-contract standard is displaced, United argues that states will pick and choose among several possible standards, some imposing liability for negligence, others for bad faith. Consequently, customers suing in one state may recover while a customer suing under another state's laws on the same facts will not.

We are not persuaded that the states' limited ability to choose among various standards of culpability undermines the federal interest in enforcing its curtailment priorities. Were a state to apply a standard of culpability less than negligence, that standard would directly conflict with the Commission's jurisdictional determination of the public interest and would be void under the supremacy clause, U.S. Const. art. VI, cl. 2. As we have already stated, only uniformity in that area is necessary to the curtailment scheme. In the unlikely event a state requires a standard of culpability higher than negligence, that choice does not implicate the federal interest. Rather, the risk of liability in those cases comes from United's culpable causation of the shortage, not from compliance with the federal curtailment scheme. Any variations in state law that are not preempted thus do not create undue preferences of federal concern.[15]

United also suggests the Commission's standard lacks uniformity and creates undue preferences because state definitions of negligence vary. Thus, United requests the Commission to define what constitutes negligence for a pipeline operating under federal regulations. We note that negligence is generally defined as the failure to

---

**15.** United points to the state court judgment in *City of New Orleans v. United Gas Pipe Line Co.,* Nos. 575–544, 579–040 (Civ.D.Ct.Parish of Orleans, La. Aug. 24, 1984), *aff'd as modified,* Nos. 3613–3614 (La.Ct.App. Apr. 30, 1987), as an example of a state court picking its own standard of culpability, one allegedly less than negligence. While we recognize that United may

have legitimate concerns about the state court's treatment of federal preemption, burden of proof, and breach of good faith duty to provide gas "whatever the cost," we have no basis for concluding other than that the Louisiana Supreme Court will enforce the federal standard and we express no opinion about the case.

exercise reasonable care, that is, the degree of care which a person of ordinary prudence would exercise in the same or similar circumstances. *See, e.g., Pampas v. Cambridge Mutual Fire Insurance Co.,* 169 So.2d 200, 201 (La.App.1964). United has not persuaded us that the several states deviate so much from this definition as to undermine the exculpation necessary to protect the federal curtailment priorities. Any variation in result that does not undermine the federal curtailment plan is not of federal concern, and therefore creates no *undue* preference.

■ Admittedly, the term "negligence" is plastic in the hands of some courts, but the federal interest is implicated only when a proffered label of negligence or other label assertedly fault-based in fact imposes liability for curtailed deliveries when curtailment was not reasonably foreseeable and avoidable. The point is that, whether addressed as an issue of causation or liability, states are not free to attach consequences to curtailed deliveries that United with reasonable efforts could not have foreseen and avoided. A state's use of the labels "negligence" or "fault" thus does not necessarily satisfy the federal standard.

We pause to emphasize this point because we are well aware that liability in contract and liability in tort are kindred spirits and blend together at their edges. For example, defining the pipeline's duty of care as derived from the contract obligations and defining the breach of the duty as negligent failure to perform is indistinguishable from the preempted contract standard in two entangled ways. First, of course, is the definition's failure to require proof that the lack of performance did not satisfy a standard of objective reasonableness. Second, liability under the improper definition does not rest on a showing that the objectively unreasonable acts proximately caused nondelivery.

Our use of *proximate* rather than producing cause is intentional to highlight the element of foreseeability inherent in the federal standard. If the need for curtailment was not reasonably foreseeable, imposition of liability for curtailments does little to encourage prudent management. However, it does a great deal to encourage the curtailing pipeline not to curtail to its firm customers, thus undermining end-use curtailment. Therefore, proof of foreseeability is a necessary element of the Commission's standard.

We also note that the federal standard imposes on customers claiming damages the burden to prove United's negligence or wrongful misconduct in causing the shortages. *See International Paper Co.,* 476 F.2d at 131–32 (Brown, J., concurring) ("[I]f *a customer* could prove this element of 'bad faith' on the part of the pipeline," liability "might" be proper (emphasis added).). A contrary rule, one placing on United the burden to prove its lack of negligence or willful misconduct, would undermine the federal interest. The contrary rule permits customers to rely on a presumption of United's liability based solely on United's failure to deliver the contract quantities of gas. That the customers' prima facie case and possible judgment may rest on this rebuttable presumption is inconsistent with the Commission's determination that liability may not rest solely on failure to deliver contract quantities of gas.[16]

Finally, United suggests that undue preferences are created by the Commission's decision to permit juries and courts to determine what constitutes negligence. In other words, United argues that uniformity in the negligence rule does not mean uniformity of result. Wary of the courts' ability to adjudicate negligence in complex fact settings, United would have liability rest on bad faith in order to ensure uniform results.

United's argument forgets that the risk of varying results in a fault-based inquiry

---

**16.** Certainly, United has the burden of establishing the defense of impossibility of performance because of an intervening government order. Nevertheless, the standard of exoneration in the tariffs is not a defense, but is a federal standard of liability that preempts inconsistent state law standards. *See International Paper Co.,* 476 F.2d at 131 (Brown, J., concurring).

comes from the Commission's displacing the risk allocated in United's contracts. While the displacement of contract risk is necessary to enforce the federal curtailment scheme, the displacement of fault-based liability is not. Indeed, results may not be uniform. But that lack of uniformity affects only United's incentives to manage prudently its supply and contract obligations. It does not affect the incentives to comply with the federal curtailment scheme. We also note the same potential for lack of uniformity exists under any standard, including the bad faith standard United would have the courts apply. Whatever variations may exist in applying the state negligence standard in accordance with this opinion, they are not undue. Furthermore, to the extent United is concerned that some of its actions taken under Commission supervision and determined to be in the public interest may become the basis of liability when evaluated by a court or jury, United is already protected under case law. *See Chicago & Northwestern Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981) (state's determination of reasonable service requirements that conflict with federal agency's determination of reasonable service requirements is invalid). Having already limited state contract law by exculpating United from strict breach-of-contract suits during curtailments, the Commission was correct to leave adjudication of negligence to the courts.

In sum, "[n]ot all parties injured as a result of the necessity to react quickly to the natural gas crisis can be made whole." *Hercules, Inc. v. FPC*, 552 F.2d 74, 89 (3d Cir.1977). As the D.C. Circuit stated:

> The difficult problem of balancing competing equities and interests has been given by Congress to the Commission with full knowledge that this judgment requires a great deal of discretion. Accordingly, it is not the role of the courts to second guess the Commission's judgment because we think we could devise a better solution than that which the agency has adopted so long as the agency's

determination has a rational basis. *Gulf Oil Corp. v. FPC*, 563 F.2d 588, 608 (3d Cir.1977). We find such a rational basis in the orders presently under review. *Arizona Electric Power Cooperative, Inc. v. FERC*, 631 F.2d 802, 809 (D.C.Cir.1980).

### B. Agency Determination of Culpability

■ United argues that the Commission's refusal to make findings about United's culpability in causing the shortage was arbitrary and capricious. We disagree.

United is procedurally barred from challenging the scope of Phase III in this appeal. On August 9, 1978, the Commission issued an order expressly defining the seven issues comprising the scope of Phase III.[17] None includes the determination of United's culpability or the circumstances surrounding the shortages. Rather, the order specifically rejected a request to determine those facts because "such questions pertain primarily to the issue of United's possible contract liability to its customers for curtailment damages rather than to issues related to the establishment of United's curtailment plan." 4 FERC ¶ 61,151, at 61,350. Evidence relating to United's culpability or to the circumstances of the shortage was admitted only as it related to the justness and reasonableness of the tariffs. *Id.* at 61,356. United's challenge to the scope of Phase III should have been raised in a request for rehearing and clarification of the August 9, 1978, order. No one sought rehearing of the order. Therefore, United's argument may not now be raised. *See Placid Oil Co. v. FERC*, 666 F.2d 976, 980 (5th Cir.1982). In any event, the argument is without merit.

■ The Commission has provided valid reasons for not determining United's liability. First, the determination of United's culpability is not inevitably relevant to the Commission's regulation of curtailment: the Commission orders curtailment schemes regardless of the culpability of the curtailing pipeline. Thus, the Commission can reasonably conclude that it is not authorized to determine the facts of the shortages. Expertise in an area is not

---

**17.** The seven issues are set forth in Part I of this opinion.

tantamount to statutory authority to act in all aspects of that area.

Second, contrary to United's assertions, our cases indicate that the Commission need not determine these facts. In *Louisiana v. FPC*, 503 F.2d 844, 867 (5th Cir. 1974), we repeated our position in *International Paper Co.*, 476 F.2d 121, 126 (5th Cir.1973), that "the Commission cannot adjudicate contract liability." The Commission correctly reads these opinions as denying it binding adjudicatory power over United's culpability and as requiring it to assume culpability in analyzing the effect of the proposed tariffs on United's liability.

The result is not changed by *Mississippi Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412 (5th Cir.1976), *cert. denied*, 429 U.S. 1094, 97 S.Ct. 1109, 51 L.Ed.2d 541 (1977), in which we upheld the stay of an action for breach of contract damages until the FPC exercised its primary jurisdiction to resolve various issues related to curtailment plans. We mentioned that "the Commission's informed opinion" on the facts and circumstances surrounding the shortage "will be of material aid to the district court in the resolution of the damage action." *Id.* at 420. This statement does not require the Commission to adjudicate culpability. Indeed, were the Commission to adjudicate United's liability, its adjudication of that essentially state common-law issue would seriously implicate article III, *see Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 105 S.Ct. 3325, 3334–35, 87 L.Ed.2d 409 (1985), and the parties' seventh amendment right to a jury trial, *see Curtis v. Loether*, 415 U.S. 189, 194–95, 94 S.Ct. 1005, 1008–09, 39 L.Ed.2d 260 (1974). Consequently, the Commission's findings would be, at best, advisory. Thus, the Commission did not arbitrarily and capriciously refuse to determine United's culpability or the facts surrounding the gas shortage.

### C. Effective Date of Tariffs

■ United argues that the Commission erred in holding that the exculpatory provision of section 12.1 of the 1952 tariff applied to direct sales customers only since the revised section 12.1 received interim approval effective November 14, 1971.[18]

The exculpation clause in section 12.1 of the 1952 tariff authorized proration of gas during times of shortage "without liability to Buyer." While recognizing that the 1952 tariff nowhere defines "Buyer," the ALJ determined that "Buyer" did not refer to direct sales customers. The ALJ's decision is supported by substantial evidence. First, the word "Buyer" is used throughout the tariff in other contexts that can apply only to resale customers and not direct sales customers. Second, United's contracts with direct sales customers made no reference to the tariff; some contained a separate "impairment of deliveries clause" that did not provide for exculpation during curtailments. Third, the Commission did not assert jurisdiction to order curtailments to direct sales customers until July of 1971, and the Supreme Court did not uphold that jurisdiction until 1972. It is unlikely that a tariff filed in 1952, long before the Commission asserted curtailment jurisdiction over direct sales, was intended to apply to direct sales.

The evidence to which United points does not change our conclusion. The ALJ was free to disregard the interested testimony of United's past president that the 1952 tariff applied to direct sales customers. Further, the fact that the tariff contained a system of curtailment priorities that included the direct sales customers does not establish that the exculpation clause applied to direct sales customers. In the curtailment priority provision, the direct sales customers are specifically identified by how they use the gas. Only the word "Buyer" identifies the entity against which the exculpation clause applies.

Nor do we consider the ALJ's interpretation of "Buyer" to conflict with a previous FPC order or with the Supreme Court's decision in *FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 92 S.Ct. 1827, 32

**18.** United does not challenge the approval of section 12.3 effective November 14, 1971, nor that section 12.1 as modified is effective since November 14, 1971.

L.Ed.2d 369 (1972). On July 2, 1971, the Commission ordered United to comply with the curtailment priorities in its tariff by preventing certain direct industrial customers from taking gas in excess of the volumes allocated them under the curtailment program United had filed with the Commission. *United Gas Pipe Line Co.*, 46 FPC 21 (1971). The order did not hold that the exculpation clause in section 12.1 applied to direct sales customers. It held only that United was bound by its own tariffs and their curtailment priorities.

*Louisiana Power & Light Co.* is also inapposite. While the Supreme Court upheld the jurisdiction of the Commission to apply curtailment plans to direct sales customers under the 1952 tariff's priority scheme, and while it follows that the Commission has jurisdiction to exculpate United from liability to direct sales customers as part of the federal curtailment plan, it does not follow that the Commission *exercised* that jurisdiction in approving the 1952 tariff. The Commission first exercised its jurisdiction to approve exculpatory clauses applicable to direct sales customers when it gave interim approval to United's proposed section 12.1, which applied to all "customers" effective November 14, 1971.

### D. Force Majeure

Finally, United argues that the Commission erred in determining that the force majeure clause in tariff section 11 [19] did not limit United's potential contract liability.

■ The Commission offered three reasons that the force majeure clause does not limit United's liability for curtailments. First, the Commission determined that United's petition of October 26, 1970, did not satisfy the tariff's notice requirements. Section 11.2 required United to give "notice and full particulars of such force majeure in writing or by telegraph to the other party as soon as possible after the occurrence of the cause relied on." The Commission determined the notice was untimely because the petition was filed some ten months after curtailment began. United objects to this finding because the petition was filed several days before the curtailments related to Phase III began. However, United has not suggested that the *cause* for the Phase III curtailments was different from the cause for the earlier curtailments. The tariff required notice as soon as possible after the occurrence of the *cause* for inability to deliver gas. The Commission's decision of untimeliness is within its authority to determine tariff compliance and is supported by substantial evidence.

The Commission also determined that the petition did not give adequate notice of the force majeure. The petition refers only to the curtailment provisions in section 12. It does not state that it gives notice of force majeure, nor does it refer to section 11. The few references in the petition to the gas shortage, then, cannot fairly be said to

**19.** Section 11 of United's tariff states:

11.1 *Definition of "Force Majeure"*—The term "force majeure" as employed herein shall mean acts of God, strikes, lockouts or other industrial disturbances, acts of public enemy, wars, blockades, insurrections, riots, epidemics, landslides, lightning, earthquakes, fires, storms, floods, washouts, arrests and restraints of governments and people, civil disturbances, explosions, breakage or accident to machinery or lines of pipe, the necessity for making tests, repairs or alterations to machinery or lines of pipe, freezing of wells or lines of pipe, partial or entire failure of wells, and any other causes, whether of the kind herein enumerated or otherwise, not within the control of the party claiming suspension and which by the exercise of due diligence such party is unable to prevent or overcome....

11.2 *Limitations on Obligations*—In the event of either Buyer or Seller being rendered unable wholly or in part by force majeure to carry out its obligations under the Service Agreement, other than to make payments due thereunder, it is agreed that on such party giving notice and full particulars of such force majeure in writing or by telegraph to the other party as soon as possible after the occurrence of the cause relied on, then the obligations of the party giving such notice so far as they are affected by such force majeure, shall be suspended during the continuance of any inability so caused but for no longer period, and such cause shall as far as possible be remedied with all reasonable dispatch.

notify the customers that United is invoking its force majeure clause. Again, the Commission's determination is supported by substantial evidence.

Second, the Commission interpreted section 11 to mean that force majeure "would not exculpate United from actions grounded in negligence or willful misconduct." Initial Decision, 20 FERC ¶ 63,070, at 65,310. The applicability of section 11 therefore "is restricted to a situation where United's conduct has been above reproach." *Id.* The Commission's interpretation of the tariff is within its authority and is rational. Any curtailments caused by United's negligence or willful misconduct are within United's control and could have been avoided by the exercise of due diligence. Thus, force majeure, by its definition, would not apply.

Third, the Commission determined that force majeure did not apply on these facts because "United was [not] forced to add new customers or to increase service to existing customers." *Id.* Supply and demand management were within United's control, the Commission determined, and therefore force majeure did not apply to the curtailments. We vacate this third reason for the Commission's determinations regarding the force majeure clause. As in the case of sections 12.1 and 12.3, it is improper for the Commission to adjudicate actual liability. In all other instances, the Commission did not make findings of fact regarding the cause of the shortage. It made only those findings necessary to interpret the tariffs or to determine whether the tariffs were in the public interest. It is inconsistent to treat the force majeure question differently. The courts adjudicating the contract actions will determine what the causes of the shortage were and whether they were beyond United's control.

## IV. INTERVENORS' OBJECTIONS

The intervenors support the Commission against United's arguments. They also level three attacks on the Commission's decisions. The intervenors first argue that the Commission lacked jurisdiction to make the revised exculpatory provisions of sec-

tions 12.1 and 12.3 applicable to direct sales customers. The intervenors also argue that the Commission erred in determining that sections 12.1 and 12.3, as revised, serve the public interest, create no undue preferences, and cause no undue prejudice. Finally, the intervenors argue that the Commission erred in making sections 12.1 and 12.3 effective November 14, 1971. In addition, Mississippi Power & Light Co. contests the Commission's construction of the substitute fuel clauses.

The Commission asserts that we lack jurisdiction of the intervenors' issues that United did not raise, for the intervenors did not file petitions for review within sixty days after Opinion No. 237-A. The Commission also asserts that Mississippi Power & Light Co. failed to raise its additional issue in its Docketing Statement. Finally, the Commission reminds us that Brooklyn Union Gas Co. and Elizabethtown Gas Co. failed to petition for rehearing of Opinion No. 237. United supports the Commission against the intervenors. We address the Commission's jurisdictional challenges.

## V. APPELLATE JURISDICTION

Section 19 of the Natural Gas Act states the jurisdictional prerequisites to review the Commission's orders:

(a) Any person ... aggrieved by an order issued by the Commission ... may apply for a rehearing.... The application for rehearing shall set forth specifically the ground or grounds upon which such application is based.... No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon....

(b) Any party to a proceeding ... aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals ... by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part.... Upon the filing of such petition such court

shall have jurisdiction ... to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so do to. 15 U.S.C. § 717r(a)–(b). Each of the statutory requirements must be satisfied for the court to have jurisdiction; we are not given "any form of jurisdictional discretion." *Boston Gas Co. v. FERC,* 575 F.2d 975, 979 (1st Cir.1978). Furthermore, the Federal Rules of Appellate Procedure apply to our review of agency orders. *Miller v. United States Postal Service,* 685 F.2d 148, 149 (5th Cir.1982), *cert. denied,* 461 U.S. 916, 103 S.Ct. 1898, 77 L.Ed.2d 286 (1983).

### A. Failure to Petition for Rehearing

■ The Commission opposes the motion of Brooklyn Union Gas Co. and Elizabethtown Gas Co. for leave to file a joint reply brief on the grounds that both failed to petition the Commission for rehearing of Opinion No. 237. Brooklyn and Elizabethtown argue that the jurisdictional requirement is satisfied so long as *any* of the participants in the court proceeding raised the objection in a petition for rehearing to the Commission.

The plain language of section 19 requires that the very party seeking judicial review must raise its objections in its own petition for rehearing to the Commission:

> Use of the definite article in the last quoted sentence ("in *the* application for rehearing," instead of "in *an* application for rehearing") makes it plain that what is referred to is the same application for rehearing mentioned earlier in subsection (b), which in turn (by reason of the same use of the definite article) clearly refers to the same application for rehearing mentioned in subsection (a), to wit, the application *of the party who seeks judicial review.*

*ASARCO, Inc. v. FERC,* 777 F.2d 764, 773 (D.C.Cir.1985). We join the D.C. Circuit in

rejecting the contention that the jurisdictional application-for-rehearing requirement is satisfied so long as any other party raised the objection. Consequently, Brooklyn Union Gas Co. and Elizabethtown Gas Co. have failed to satisfy the jurisdictional requirements necessary for us to consider their objections to the Commission's orders.[20] We therefore deny the Brooklyn Union Gas Co. and Elizabethtown Gas Co. leave to file a joint reply brief.

### B. Failure to Petition for Review

A second jurisdictional requirement is that each party seeking review of an order must file, "within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part." 15 U.S.C. § 717r(b). The Commission has moved to dismiss the intervenors' issues for want of jurisdiction because the intervenors did not file petitions for review within the sixty-day period. United has moved to strike all portions of the intervenors' briefs dealing with the additional arguments because, as the Commission argued, the intervenors failed to comply with section 19 and also because the intervenors failed to comply with Fed.R.App.P. 15 and Local Rule 15. The intervenors respond that they may properly raise additional issues through their notices of intervention, that a petition for review is not required. Alternatively, they argue that their notices of intervention should, on the facts of this case, be treated as petitions for review.

#### 1. *Intervention and Additional Issues*

Section 19 of the Natural Gas Act does not expressly state that intervenors in a review proceeding may not raise issues additional to those raised by the parties filing petitions for review. Nevertheless, Federal and Local Rules of Appellate Procedure, as well as case law, establish that intervention does not satisfy the Natural Gas Act's requirement for a "written petition praying that the order of the Commission be mod-

---

**20.** The other intervenors complied with the requirement in section 19 to raise on review only those issues for which each intervenor sought rehearing before the Commission.

ified or set aside in whole or in part." Consequently, in a proceeding under the Natural Gas Act, we do not have jurisdiction to consider intervenors' issues that are in addition to those raised in petitions for review.

Fed.R.App.P. 15 governs review of agency orders. Fed.R.App.P. 15(a) provides that a party seeking review of an agency order "shall" file a "petition for review" with the clerk of the court of appeals. Rule 15(a) also provides that "[t]he petition shall specify the parties seeking review and shall designate the respondent and the order or part thereof to be reviewed."[21] Fed.R.App.P. 15(d) also permits intervention if the person desiring to intervene, within thirty days of the date on which the petition for review is filed, files with the clerk of the court of appeals and serves on all parties a motion for leave to intervene. The form of the motion differs from that for a petition for review and must "contain a concise statement of the interest of the moving party and the grounds upon which intervention is sought." Although Fed.R.App.P. 15(d) does not expressly state that intervenors are limited to the issues raised in petitions for review, Fed.R.App.P. 15(a) quite plainly mandates that "[r]eview of an order ... *shall be obtained* by filing" a petition for review in compliance with Rule 15(a) (emphasis added).

 Furthermore, Fed.R.App.P. 15(a) states that the petition for review must be filed "within the time prescribed by law," while Fed.R.App.P. 15(d) states that the notice of intervention "shall be filed within 30 days of the date on which the petition for review is filed." By defining the time for filing a petition for review with reference to the statute providing for review of the agency's orders, the Rule indicates that the petition for review in Fed.R.App.P. 15(a) is the only proper form to seek review of agency action. In contrast, by specifying a separate time limitation for the filing of notices of intervention, the Rule indicates that a notice of intervention is not a petition praying for review within the meaning of the applicable statute.

Our Local Rule 15 reinforces this conclusion by making clear that only parties filing petitions for review may state which issues are to be raised for review. Local Rule 15.3.4, which controls the Docketing Statement, provides that "all parties *filing petitions for review* shall file a joint Docketing Statement which shall ... [l]ist each issue to be raised in this review" (emphasis added). Local Rule 15.3.4 also provides that "[e]very petitioner *who files for review* after a Docketing Statement has been filed shall specify *in the petition for review* any exceptions taken *or additions* to the issues listed in the Docketing Statement" (emphasis added). In contrast, intervenors may not specify additional issues. Rather, they must specify in the notice of intervention only "any exceptions taken to the issues listed in the Docketing Statement."

The intervenors try to avoid the clear meaning of Fed.R.App.P. 15 and Local Rule 15.3.4 by pointing to Local Rule 15.3.3, which governs intervention and states:

*Party.* A party to a Commission proceeding may intervene in a review of the same proceeding in this court by filing a notice of intervention in the docket assigned to the petition for review of any order entered in such proceeding. The notice shall state whether the intervenor is a petitioner who objects to the order or a respondent who supports the order. *A notice of intervention shall confer petitioner or respondent status on the intervening party as to all proceedings in the docket* (emphasis added).

**21.** The Rules provide a suggested form for petitions for review:

PETITION FOR REVIEW OF ORDER OF AN AGENCY, BOARD, COMMISSION OR OFFICER

United States Court of Appeals for the _____ Circuit.

A.B., Petitioner ]
v. ] Petition for Review
XYZ Commission, ]
Respondent ]

A.B. hereby petitions the court for review of the Order of the XYZ Commission (describe the Order) entered on _____, 19__.

S. _____
 Attorney for
 Petitioner

_____
 (Address)

The intervenors argue that this rule confers on them all the rights of those filing petitions for review, including the right to raise additional issues.

The intervenors' interpretation asks too much of Local Rule 15.3.3. If Local Rule 15.3.3 means what intervenors assert, the language in Local Rule 15.3.4 allowing parties filing petitions for review to list additions to the issues in the Docketing Statement, but allowing parties filing notices of intervention to specify only "exceptions taken" to the issues in the Docketing Statement, would be meaningless. The more consistent interpretation is that Local Rule 15.3.3 confers on intervenors full ability to participate as petitioners or respondents for those issues that the parties filing petitions for review list in the Docketing Statement. Thus, intervenors' status as petitioners or respondents extends, as Local Rule 15.3.3 states, "to all proceedings *in* the docket," but not to add issues to the docket.

A contrary interpretation of intervenors' ability to raise additional issues would create an unnecessary conflict between section 19 of the Natural Gas Act and Fed.R. App.P. 15. Section 19 requires that the petition to modify or set aside the Commission Order be filed within sixty days of the order on rehearing. Fed.R.App.P. 15(a) sets the time for filing a petition for review in accord with "the time prescribed by law," in this case, the sixty-day requirement of section 19. Fed.R.App.P. 15(d), in contrast, permits the filing of motions to intervene "within 30 days of the date on which the petition for review is filed." If we permit an intervenor to raise additional issues for review, we contravene the sixty-day filing limit in section 19 by permitting filings as late as 90 days after the order on rehearing to seek modification or setting aside of the Commission's orders.[22]

██ If, to cure this conflict with the time limits in section 19, we require notices of intervention to be filed within sixty days of the Commission's order on application for rehearing, then we have effectively amended Fed.R.App.P. 15(d) to require notices of intervention to be filed "within the time prescribed by law," as Fed.R.App.P. 15(a) states, instead of "within 30 days of the date on which the petition for review is filed," as Fed.R.App.P. 15(d) actually states. These anomalies are avoided by our holding that intervenors in a proceeding to review FERC action may not raise issues in addition to those raised by parties filing petitions for review. Thus, interventions will not implicate section 19's jurisdictional time limits, nor require a modification of Fed.R.App.P. 15(d).[23]

Although no case has addressed the precise jurisdictional issue before us, we agree

---

22. The ninety days is reached when a petition for review is filed on the sixtieth day after the order on application for rehearing, as Fed.R. App.P. 15(a) provides, and the notice of intervention is filed 30 days later, as Fed.R.App.P. 15(d) provides. Since our practice has been at times to grant motions for leave to intervene out of time, as we did for Southern Natural Gas in this case, the jurisdictional time limitation in section 19 could be further eroded.

23. Our holding also ensures that all parties seeking review will raise their issues in time to comply with the deadlines for filing Docketing Statements, thus ensuring timely notice to all parties of the issues on appeal and of each party's posture with respect to the issue. Local Rule 15.3.4 provides that all parties filing petitions for review must file a Docketing Statement "[w]ithin 30 days of the initial petition for review, but not later than 10 days after the expiration of the period permitted for filing a petition for review." Plainly, this deadline can be met only if all parties raising issues have filed their petitions before 70 days from the order on application for rehearing.

The Clerk of this Court informed the parties that the Docketing Statements were due on August 26, 1986, ten days after the expiration of the sixty-day period for filing petitions for review. United complied with the deadline, although under our reading of Local Rule 15.3.4 its Docketing Statement was due July 16, 1986, on the thirtieth day of the filing of the initial petition for review. The intervenors, on the other hand, flouted both Local Rule 15.3.4 and the clerk of the court by filing Docketing Statements late or not at all.

While we are inclined to dismiss the intervenors' extra issues for failing to docket their issues timely, *see International Merger & Acquisition Consultants, Inc. v. ARMAC Enterprises, Inc.*, 531 F.2d 821, 825 (7th Cir.1976), we shall dispose of their issues on jurisdictional grounds and admonish these parties to comply with the proper deadlines in the future.

with the Seventh Circuit's decision in *Illinois Bell Telephone Co. v. FCC*, 740 F.2d 465 (7th Cir.1984), in which the court granted petitioner's motion to strike portions of an intervenor's brief attacking a portion of the FCC order that the petitioners had not challenged. The Seventh Circuit stated:

> The Association was entitled to intervene in this proceeding because it has an interest in the outcome. See 28 U.S.C. § 2348. But it was not entitled to intervene for the purpose it did, that is, to challenge rather than defend the order. If it had wanted to challenge the order it had to file a petition for review, or a cross-petition within 14 days after the filing of the first petition for review; it could readily have done either, since it was a party to the proceeding before the agency. This is the rule for appeals from district courts, see Fed.R.App.P. 4(a)(3); *Martin v. Hamil*, 608 F.2d 725, 730–31 (7th Cir.1979), as well as for review of decisions of administrative agencies, see Fed.R.App.P. 1[5](a); *Bath Iron Works Corp. v. White*, 584 F.2d 569, 573 n. 2 (1st Cir.1978); 9 Moore's Federal Practice ¶ 204:11[2] (2d ed. 1983).

740 F.2d at 477. Thus, intervenors in FERC review proceedings are bound by the issues raised in the petitions for review. With regard to the issues raised in the petitions, intervenors may fully argue for or against the Commission's position. However, the intervenors may not challenge aspects of the Commission's orders not raised in the petitions for review.

The intervenors cite to *United States Steel Corp. v. EPA*, 614 F.2d 843 (3d Cir. 1979), as authority that an intervenor may raise additional issues. In *United States Steel Corp.*, U.S. Steel timely petitioned for review of an EPA order and Scott Paper Company timely filed a motion seeking leave to intervene after the time to petition for review had passed. After U.S. Steel obtained dismissal of its petition for review, the Third Circuit permitted Scott Paper Co. to continue to press its claims, even though Scott had not timely filed a petition for review. We do not read *United States Steel Corp.* as support that intervenors may raise issues in addition to those raised in petitions for review, for Scott Paper and U.S. Steel both challenged "the EPA limitations on the sulphur content of fuels in southeastern Pennsylvania" as stated in 40 C.F.R. § 52.2020(c)(18). *United States Steel Corp.*, 614 F.2d at 844. The opinion does not suggest that Scott Paper raised issues U.S. Steel did not raise, but suggests only that U.S. Steel did not adequately represent Scott Paper's interests. *See id.* Furthermore, unlike the statute authorizing review in *United States Steel Corp.*, section 19 of the Natural Gas Act confers jurisdiction in this court only over those objections that the petitioner asserts in its application for rehearing and reasserts in its petition for review. That is, our jurisdiction attaches only to those aspects of the order properly challenged, and not to the whole order. Under section 19, each party seeking review of an issue must independently establish our jurisdiction to review the issue.[24]

The cases intervenors cite from the D.C. Circuit are also inapposite. In *New South Media Corp. v. FCC*, 644 F.2d 37, 38 (D.C. Cir.1981), the court recognized what we recognize already in Local Rule 15.3.3: a party with standing to appeal may instead intervene in an appeal brought by another party to the proceeding. However, *New South Media Corp.* did not address whether the intervenor was therefore limited to the issues raised in the other party's appeal. In *California Public Broadcasting Forum v. FCC*, 752 F.2d 670, 682–83 (D.C. Cir.1985), the court *granted* the FCC's motion to strike the portions of the intervenor's brief challenging the FCC's order. The court rested on the fact that the FCC "had no opportunity to respond since [the intervenor] filed its brief *after* the FCC (to the schedule of an intervenor in support of

---

**24.** Nor do considerations of "judicial economy and prompt disposition of litigation" suggest a different result. In this circuit, multiple petitions for review do not create docket confusion because "[a]ll petitions for review and other documents concerning Commission orders in the same number series (*i.e.*, 699, 699A, 699B) shall be assigned to the same docket in this Court." Local Rule 15.3.2.

the FCC)," and because the intervenor's "notice of intervention was inadequate to allow these arguments to be fairly introduced." *Id.* at 683. It was in its reliance on notice instead of procedure that the D.C. Circuit's reasoning differed from the Seventh Circuit's. *See id.* at 683 n. 10. Finally, although we are persuaded that the decisions of the Third and D.C. Circuits are distinguishable, to the extent they are not, we join the Seventh Circuit's decision in *Illinois Bell Telephone Co.*

### 2. *Notice of Intervention as a Petition for Review*

The intervenors argue that, despite their filing notices of intervention, we should treat their notices as petitions for review. Specifically, the intervenors assert that they complied with the Natural Gas Act because they filed notices within sixty days of Opinion 237–A and because the notices indicate an intention to seek review of the Commission's orders in whole or in part. Thus, the intervenors would have us divorce section 19 and Fed.R.App.P. 15, overlook the intervenors' deviations from Fed. R.App.P. 15 and Local Rule 15, and address the merits of the additional issues.

While we are unclear about our purported power to treat a notice of intervention as a petition for review, we decline to do so here. We cannot divorce the Federal Rules from this case, because we held that the written petition required in section 19 is the petition for review governed by Fed.R. App.P. 15(a), not a notice of intervention under Fed.R.App.P. 15(d).

Even setting aside the formal differences in the contents of petitions for review and notices of intervention, other problems remain. By identifying themselves as petitioners, the intervenors were expected to

align themselves with the party petitioning for review. In no issue, however, are the intervenors aligned with United. In fact, the intervenors are aligned with the respondent on all of United's issues. Admittedly, the obvious notice problem may be cured in the Docketing Statements. Here we have the additional complication that the intervenors' Docketing Statements—assuming *arguendo* that intervenors may file Docketing Statements [25]—were not timely filed. Finally, Local Rule 15.1 requires payment of a $65.00 fee at the time of filing the petition for review. No fee is required for notices of intervention, and intervenors have not paid or tendered the fee for petitions for review.

▆ In sum, we are not persuaded that intervenors' notices of intervention should be treated as petitions for review, even if we in our discretion could do so.[26] Because intervenors failed to satisfy the jurisdictional requirements of section 19 of the Natural Gas Act, the motion of respondent, Federal Energy Regulatory Commission, to dismiss the additional issues raised in intervenors' Docketing Statements and to limit the issues on appeal to those raised by the sole petitioner, is granted. For the same reasons, the motion of United to strike those portions of the briefs of New Orleans Public Service, Inc., Mississippi Power & Light Co., Louisiana Public Service Commission, Louisiana Power & Light Co., and the City of New Orleans that challenge the Federal Energy Regulatory Commission's orders under review here is granted.[27]

### VI. CONCLUSION

In sum, we vacate that portion of the Commission's orders that determined that force majeure did not apply on the facts.

---

**25.** Local Rule 15.3.4 makes clear that intervenors cannot file Docketing Statements. They may only indicate "any exceptions taken to the issues listed in the Docketing Statement."

**26.** We note that Mississippi Power & Light's challenge to the Commission's interpretation of the substitute fuel clauses must be dismissed regardless of our decision on jurisdiction, for MP & L failed to raise the issue in its Docketing Statement. We also note that the substance of the intervenors' first argument has been rejected

anyway in our discussion of Commission jurisdiction.

**27.** Because of our disposition of the intervenors' issues, United's motion to strike portions of the briefs of the City of New Orleans and the Louisiana Public Service Commission for failure to provide page references to the record is no longer relevant to the outcome of the case, and is therefore denied.

In all other respects, the orders of the Commission are affirmed. VACATED in part, and AFFIRMED in part.