**COLORADO INTERSTATE GAS COMPANY,**
Plaintiff/Counterclaim–Defendant/Appellee,

v.

**NATURAL GAS PIPELINE COMPANY OF AMERICA; NGPL–Trailblazer, Inc., Defendants/Counter-claimants/Appellants,**

v.

**WYOMING INTERSTATE COMPANY, LTD.; the Coastal Corporation, Counterclaim–Defendants/Appellees.**

Midcon Ventures, Inc.,
Counterclaimant.

Federal Energy Regulatory Commission,
Amicus Curiae.

Nos. 87–2109, 87–2123.

United States Court of Appeals,
Tenth Circuit.

Sept. 11, 1989.

Michael L. Beatty of Colorado Interstate Gas Co., Colorado Springs, Colo., (Rebecca H. Noecker of Colorado Interstate Gas Company, Colorado Springs, Colo., William F. Baxter of Shearman & Sterling, Stanford, Cal., William C. McClearn, James E. Hartley, Joseph W. Halpern, Elizabeth A. Phelan, and Timothy M. Rastello of Holland & Hart, Denver, Colo., J. Kent Rutledge of Lathrop & Uchner, P.C., Cheyenne, Wyo., with him on the briefs), for plaintiff/counterclaim-defendants/appellees.

Phillip Areeda, Cambridge, Mass., (William H. Brown of Brown & Drew, Casper, Wyo., Paul J. Hickey of Rooney, Bagley, Hickey, Evans & Statkus, Cheyenne, Wyo., Gerald M. Stern and Charles E. Foster, Los Angeles, Cal., Joseph M. Wells and Paul E. Goldstein, Lombard, Ill., John T. Cusack and Michael P. Padden of Gardner, Carton & Douglas, Chicago, Illinois; J. Curtis Moffatt and Paul Korman of Gardner, Carton & Douglas, Washington, D.C., Harvey I. Saferstein and Steven A. Marenberg of Irell & Manella, Los Angeles, Cal., and Louis Nizer and Paul Martinson of Phillips, Nizer, Benjamin, Krim & Ballon, New York City, with him on the brief), for defendants/counterclaimants/appellants.

Catherine C. Cook, Gen. Counsel, Jerome M. Feit, Sol., and Joshua Z. Rokach, Atty., of the F.E.R.C., Washington, D.C., for amicus curiae.

Before MOORE, ANDERSON, and BALDOCK, Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This is an appeal from an order of the district court refusing to grant judgment notwithstanding the verdict or a new trial for the defendants, Natural Gas Pipeline Company of America (Natural) and NGPL-Trailblazer. 661 F.Supp. 1448. The jury awarded the plaintiff, Colorado Interstate Gas Company (CIG), $724,033,361 in damages based on CIG's claim that Natural attempted to monopolize the market for long distance transportation of Wyoming gas, breached its contract with CIG; and tortiously interfered with CIG's contractual relations. While the district court reduced the jury award to $412,237,972, Natural argues that the district court failed to rectify the underlying legal errors on which the judgment was based.

Natural deploys a two-pronged attack against each of CIG's claims. First, it asserts that the award of damages for conduct approved by the Federal Energy Regulatory Commission (FERC) impermissibly interferes with FERC's authority to regulate gas sales and transportation markets. Second, Natural argues, in the alternative, that the substantive law of contracts, torts, and antitrust, requires the reversal of the jury's verdict on each claim. We hold that in light of FERC's orders concerning the basic issues underlying the breach of contract dispute, deference to FERC authority requires that we reverse the breach of contract verdict. We further hold that CIG failed to establish there was a dangerous probability that Natural would monopolize the long distance transportation market. Therefore, we reverse the antitrust verdict. The claim for tortious interference with contractual relations neither interferes with FERC's authority nor is substantively flawed; thus, the jury's verdict on that claim will stand.

## I. *Introduction*

CIG and Natural are owners of pipelines which transport natural gas. For many years, Natural has purchased gas from CIG and transported that gas to markets in the Midwest and East. In July 1982, CIG and Natural entered into a new contract (the Service Agreement or Agreement) which obliged CIG to deliver and Natural to purchase specified quantities of natural gas. CIG sold two types of gas to Natural. Field gas was sold at a lower rate (F-1 rate) than gas which was delivered from CIG's main transmission line (H-1 rate). The contract set forth how much gas Natural was required to purchase, both on a annual and on a daily basis. Like previous service agreements between Natural and CIG, the 1982 Service Agreement also contained a minimum bill provision which allowed CIG to bill Natural at a predeter-

mined rate for gas which Natural reserved but did not purchase.

Because CIG's Service Agreement with Natural involved the interstate sale of natural gas, the rates and terms specified in the Agreement required approval by FERC. When, in 1982, CIG sought FERC approval, Natural intervened to protest both the rate increase and its contractual obligation to pay CIG for gas it did not purchase. In response to Natural's intervention, FERC modified the terms of the Service Agreement to reduce the price Natural was required to pay for unpurchased gas.

In July 1983, Natural sharply reduced its gas purchases from CIG. Natural paid CIG what Natural determined to be the FERC modified rate for unpurchased gas. Natural's decrease in purchases forced CIG to stop purchasing gas from some of its suppliers. One of those suppliers, Champlin Petroleum, supplied gas to CIG from the Whitney Canyon gas fields in southern Wyoming. Although Natural claimed that it quit purchasing gas from CIG because it had an oversupply of gas, the evidence made this claim problematical. As soon as CIG ceased purchasing Whitney Canyon gas, Natural made arrangements to purchase that gas directly from Champlin. Indeed, CIG presented evidence that Natural purchased gas from many sources to replace lost volumes from CIG. This substitute gas was often more expensive than CIG's gas. On occasion, Natural resumed purchases of gas from CIG when CIG was attempting to sell gas to new customers. Natural's decision to stop purchasing gas and the losses CIG experienced as a result of that decision form the basis of this litigation.

## II. *CIG's Common Law Claims*

### A. Breach of Contract

The district court instructed the jury that it could find Natural breached the Service Agreement only if Natural failed to purchase gas *and* refused to pay CIG the rate that FERC decided was appropriate for volumes not purchased. Neither party disputes that Natural refused to purchase gas. The parties dispute the rate FERC determined to be appropriate for gas not taken. Natural argues that the district court should have directed a verdict on the breach of contract claim in its favor because it paid CIG the FERC determined rate for gas not purchased. We agree.

In order to apprehend the parties' arguments on this issue, it is necessary to examine the long history of the dispute over Natural's minimum purchase obligation before FERC.[1] For many years the service agreements between CIG and Natural contained two provisions which, together, defined Natural's minimum purchase obligation.[2] Section 2 of the Service Agreement, the "minimum daily take provision," required Natural to accept *each day* 90% of its General Daily Entitlement.[3] Section 4

---

1. The difficulty that CIG and Natural faced with the minimum purchase obligation was not unique. Minimum purchase obligations in gas contracts became a problem for the industry in the early 1980's, as a nationwide gas surplus forced many purchasers to curtail their takes. The huge liability incurred by purchasers forced FERC to take action on two procedural levels. First, FERC considered purchasers' objections to minimum purchase requirements on a case by case basis and modified service agreement provisions where necessary. Second, because minimum purchase obligations were widespread in the natural gas industry, FERC issued general orders that modified certain provisions in all gas contracts. Thus, the conflict between CIG and Natural was just a small part of a significant problem which required FERC's continued attention.

2. For purposes of this opinion we are using the term "minimum purchase obligation" to refer to contract terms which seek to insure that gas buyers purchase a minimum volume of gas. These provisions are sometimes called "take or pay," "minimum bill," or "minimum take" provisions. Although the precise details or mechanisms of these provisions might differ, they have similar effects.

3. Section 2 of the Service Agreement entitled "POINTS OF DELIVERY, MAXIMUM DAILY VOLUME OBLIGATIONS, AND PRESSURES" includes Natural's daily purchase obligation. It states:

   Variations in daily takes may be made at Buyer's election at H–1 delivery points to meet its varying load conditions, however, Buyer shall not request total daily volumes on

of the Service Agreement, the "minimum annual bill," required Natural to purchase *each year* 90% of its Total Annual Entitlement, or pay CIG a predetermined rate for gas not purchased.[4]

Natural first objected to the minimum purchase obligation in the Service Agreement when CIG sought approval of the rates and terms of the Agreement from FERC in 1982. The reasonableness of the minimum purchase obligation was considered in administrative proceedings before an administrative law judge in 1983. The judge found the "minimum bill provisions" to be unreasonable and ordered CIG to modify the Service Agreement so that CIG could collect from Natural only the fixed costs[5] associated with the sale of gas. This decision was appealed to FERC, which, in response, modified the precise mechanism by which CIG could collect money for unpurchased gas but left unchanged the basic ruling that CIG could collect only fixed costs for unpurchased gas.[6]

In response to FERC's ruling, CIG submitted to FERC a modification of its Service Agreement by which it sought to collect F–1 fixed costs for F–1 gas which Natural did not purchase and H–1 fixed costs for unpurchased H–1 gas. Since the fixed cost component of gas rates included profits on the sale of gas, CIG's submitted rate would have insured full profits on unsold gas. However, FERC did not approve this rate for unpurchased gas.[7] It

ruled that CIG could collect only F–1 fixed costs for whichever type of gas Natural did not purchase. CIG appealed FERC's order to this court asserting that it should collect full profits on unsold gas. We rejected this appeal. *Colorado Interstate Gas Co. v. FERC,* 791 F.2d 803 (10th Cir.1986), *cert. denied,* 479 U.S. 1043, 107 S.Ct. 907, 93 L.Ed.2d 857 (1987).

CIG now argues that these extensive proceedings only considered one aspect of the minimum purchase obligation, namely, the minimum annual bill provision (Section 4) of the Service Agreement. It insists FERC simply overlooked the minimum daily take requirement (Section 2) in the individual proceedings. CIG asserts that the minimum daily take requirement was later modified by FERC's Order No. 380–C which ruled that minimum take provisions were meant to be governed by Order No. 380.

Although FERC's general orders treated minimum bill provisions identically with minimum take provisions, CIG argues that because FERC Order No. 380–C states sellers may collect fixed costs,[8] CIG may collect F–1 fixed costs for unsold F–1 gas and H–1 fixed costs for unsold H–1 gas. If we were to accept CIG's argument, CIG could collect a higher rate for each year that Natural failed to purchase gas by adding up its compensation for Natural's *daily* failure to take gas than it could by using the individually tailored FERC formula for determining CIG's compensation for Natu-

---

any day hereunder less than 90 percent of the General Daily Entitlement.

4. Section 4 entitled "MINIMUM BILL" states, in relevant part:

The minimum bill shall be ... determined by multiplying the Total Annual Entitlement by a factor of 90 percent, such volume hereinafter referred to as "Minimum Volume." ... *In the event the Buyer's actual purchases for the fiscal year are less than the Minimum Volume, then any deficiency shall be billed at the unit fixed cost component under Rate Schedule F–1....*
(Emphasis added.)

5. Fixed costs are costs which CIG must incur regardless of the volume of gas it sells. The fixed cost component of the commodity charge also includes a sum representing profits on

CIG's operations. The major nonfixed (variable) cost, which CIG was forced to eliminate from the rate it could charge Natural, was the cost of gas.

6. On the same day, FERC issued Order No. 380 which required gas sellers to modify their minimum bill provisions to collect only fixed costs for unpurchased gas.

7. FERC explained that allowing CIG to collect only F–1 fixed costs for the more expensive H–1 gas would give CIG a strong incentive to sell H–1 gas instead of merely collecting fees for undelivered gas.

8. Since Order No. 380–C was a general order, it did not specify the precise value of the fixed cost CIG, or any other sellers, could collect for unsold gas.

ral's *annual* failure to purchase gas. Aside from the irrationality of this result, we think it ignores the fact that FERC has plainly examined both the minimum annual bill and the minimum daily take requirements in the Service Agreement since the original ALJ decision.

As noted earlier, the ALJ stated that he found the minimum bill provisions to be unjust and unreasonable. CIG apparently assumes this reference to the minimum bill provisions meant that the ALJ only considered the minimum annual bill (Section 4) of the contract. Yet, the rest of the opinion makes clear that the ALJ considered both Sections 2 and 4 of the Service Agreement. For instance, in describing the Service Agreement the ALJ stated, "CIG's mode of billing to Natural under the F-1 and H-1 Rate Schedules is explained for the situation when the minimum bill provisions operate because Natural failed to take 90 percent of its *daily* or *annual* volumetric entitlements." *Colorado Interstate Gas Co.*, 25 F.E.R.C. ¶¶ 63,012, 65,015 (Oct. 18, 1983) (emphasis added). The ALJ clearly understood that the Service Agreement provided a single rate of compensation for failure to purchase gas on a *daily or annual* basis and that he was modifying that rate.

This conclusion is confirmed by subsequent FERC orders. In its order of June 1985, FERC surveyed the entire history of CIG's proceedings before the agency on the minimum purchase issue. FERC stated the ALJ found "*both* the minimum annual volume and the minimum daily take requirement in CIG's Service Agreement" to be unreasonable. *Colorado Interstate Gas Co.*, 31 F.E.R.C. ¶ 61,325 (June 19, 1985). FERC further noted that the *individualized proceedings* required CIG to modify both the minimum annual bill and the minimum daily take provisions to eliminate variable costs. *Id.* The only formula for the elimination of variable costs approved in the individualized proceedings required CIG to charge F-1 fixed costs for failure to purchase either F-1 or H-1 gas. The inescapable conclusion is that FERC regarded this as the sole remedy for failure to pur-

chase gas under either contractual provision.

Finally, FERC's amicus brief explains its current interpretation of the FERC proceedings on the minimum purchase issue. The amicus brief states:

> [T]he district court erred in holding that the Commission did not deal with the minimum purchase obligation and that therefore CIG may litigate that issue in this case ... the Commission treated the minimum bill as the remedy for Natural's failure to live up to its minimum purchase obligation ... therefore, the district court erred in its perception that the minimum bill and take provisions were separate and discrete matters establishing distinct remedies.

In light of the deference we owe to FERC's interpretations of its own orders, *Colorado Interstate Gas*, 791 F.2d at 810; *Distrigas of Massachusetts Corp. v. Boston Gas Co.*, 693 F.2d 1113, 1119 (1st Cir.1982), and the plain meaning of the orders themselves, there is simply no room for CIG's assertion that FERC's individualized proceedings left the minimum daily take provision (Section 2) of the Service Agreement unaffected.

### B. Breach of Duty of Good Faith and Fair Dealing

██ Natural argues the jury's verdict on bad faith breach of contract must be reversed because FERC's modification of the rate Natural was required to pay CIG for unpurchased gas gave Natural the *unqualified* right to stop purchasing gas, provided it paid CIG the FERC established price for unpurchased gas. Natural insists that by awarding CIG damages for bad faith failure to purchase gas that were greater than FERC's established rate for failure to purchase, the district court allowed state common law to impinge upon FERC's regulatory authority. CIG asserts that Natural's bad faith alters the character of Natural's conduct so that the FERC rate for unpurchased gas does not apply. While we are unwilling to embrace Natural's claim that FERC's orders shield it from all liability for failure to purchase gas, we do agree that Natural is free from liability for failure to purchase gas based upon the implied

duty of good faith and fair dealing in the Service Agreement.

The Supreme Court is wary of attempts by parties, dissatisfied with determinations of federal agencies, to neutralize the effect of those determinations through common-law actions for damages. *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 324, 101 S.Ct. 1124, 1133, 67 L.Ed.2d 258 (1981); *Arkansas Louisiana Gas Co. v. Hall,* 453 U.S. 571, 577 n. 6, 101 S.Ct. 2925, 2930 n. 6, 69 L.Ed.2d 856 (1981). These cases are bottomed on the principle that the Supremacy Clause requires state regulation not thwart federal policy. *Kalo Brick & Tile,* 450 U.S. at 326, 101 S.Ct. at 1134. Common-law claims that seek to litigate matters already decided by a federal agency are therefore preempted.

For instance, in *Kalo Brick & Tile,* 450 U.S. at 311, 101 S.Ct. at 1127, a shipper of goods by rail, sought to assert a state, common-law tort action for damages caused by a regulated rail carrier's decision to eliminate service on a rail line. The Supreme Court unanimously held that because the Interstate Commerce Commission had, in approving the cessation of service in administrative proceedings, ruled on all the issues underlying the shippers state-court suit, the common-law action was preempted. The Court stated: "It is difficult to escape the conclusion that the instant litigation represents little more than an attempt by a disappointed shipper to gain from the Iowa courts the relief it was denied by the commission." *Id.* at 324, 101 S.Ct. at 1133.

Through its common-law claim of breach of the contractual duty of good faith and fair dealing, CIG obtained an award of damages that allowed it to collect H-1 fixed costs for unpurchased H-1 gas. FERC and this court have repeatedly denied CIG's request to modify the minimum purchase obligation of the Service Agreement to allow it to collect this rate for

failure to purchase gas. *Colorado Interstate Gas,* 791 F.2d at 808–09. By allowing CIG to press this claim, the district court gave CIG a second chance to which it was not entitled.

Nevertheless, CIG argues that this case is distinguishable from *Kalo Brick & Tile*[9] and is not a collateral attack upon FERC's decision because FERC denied CIG H-1 fixed costs for unpurchased H-1 gas only if Natural decided not to purchase gas in good faith. CIG contends, once Natural decided to "shut in" CIG's gas in order to harm CIG, FERC's remedy for failure to purchase gas, a remedy which did not allow collection of H-1 fixed costs, was no longer intended by FERC to apply. Essentially, CIG is asking us to imply a good faith limitation upon the scope of FERC's remedy for failure to purchase gas.

While we find CIG's argument forceful, we cannot ignore the Supreme Court's vigorous effort to insure agency action is not blunted by state regulation. *See, e.g., Nantahala Power and Light Co. v. Thornburg,* 476 U.S. 953, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) (state regulated rate for retail sale of gas did not give enough *weight* to FERC determined rate for wholesale gas sales); *Kalo Brick & Tile,* 450 U.S. at 326, 101 S.Ct. at 1134. We think that limiting the scope of the FERC developed remedy for failure to purchase gas in the manner suggested by CIG would permit circumvention of FERC authority through state contract law. In order for FERC's remedy to be effective, it must have room to breathe. As the Supreme Court has stated, "Respondents' theory of the case would give inordinate importance to the role of contracts between buyers and sellers in the federal scheme for regulating the sale of natural gas." *Arkansas Louisiana Gas,* 453 U.S. at 582, 101 S.Ct. at 2932. We think this statement applies with equal force to this case.

---

**9.** The Court in *Kalo Brick & Tile* emphasized that the "commmission has actually addressed the matters [the customer] wishes to raise in state court." 450 U.S. at 327, 101 S.Ct. at 1135. The Court reserved the question of whether "a state court suit is barred when the commission

is empowered to rule on the underlying issues." *Id.* In this case, FERC was not explicitly confronted with the question of whether Natural's motive for not purchasing gas would be relevant to the rate CIG could collect for that gas.

Further, the limited evidence we have suggests FERC intended the collection of F–1 fixed costs to be the exclusive contract remedy for failure to purchase gas. FERC's amicus brief notes the jury awarded damages for antitrust, tort, and breach of contract claims. Nevertheless, FERC *only* sought to have the damages for breach of contract reversed. FERC did not distinguish between the breach of contract damages awarded for bad faith failure to purchase gas and those awarded for failure to purchase gas under Section 2 of the Service Agreement.[10]

This interpretation of FERC's intent mirrors FERC's interpretation of the scope of its actions in a closely analogous context. During the gas shortage of the early 1970's, FERC permitted sellers of gas to curtail their contractually agreed upon deliveries of gas, if the curtailment was carried out in accordance with plans on file with FERC. *See, e.g., United Gas Pipe Line Co. v. FERC*, 824 F.2d 417, 421 (5th Cir.1987). Buyers who did not receive gas they contracted for sued sellers based upon breach of contract and various tort theories. *Id.; see also CF Industries v. Transcontinental Gas Pipe Line*, 614 F.2d 33 (4th Cir.1980). In response, sellers sought to have FERC modify their service agreements to exculpate them from liability for failure to deliver gas to buyers curtailed under curtailment plans. FERC declined to deny the purchasers all remedies for the sellers' failure to deliver gas stating:

> Claims that are essentially *"breach of contract"* in nature and arise because of curtailments initiated and conducted in accordance with effective curtailment tariffs are preempted by federal law, which nullifies them. But claims that require a finding of *negligence* to permit recovery remain unaffected.

*Transcontinental Gas Pipe Line*, 35 F.E.R.C. ¶¶ 61,043, 61,080 (April 7, 1986) (emphasis added).[11]

We believe FERC intended to draw the same line for failure to take gas as it drew for failure to purchase. Actions based upon tort were not meant to be preempted by FERC's modification of the contract, while actions based upon breach of contract were. Any other distinction would impermissibly undermine the effectiveness of FERC orders. Thus, the jury's verdict for bad faith breach of contract must be reversed.

## C. Tortious Interference with Contract

The gravamen of CIG's tortious interference with contract claim is that Natural intentionally stopped taking gas from CIG in order to force CIG to relinquish its contractual right to purchase Whitney Canyon gas from Champlin Petroleum. CIG alleged Natural was motivated by a desire to acquire the rights to purchase Whitney Canyon gas. After CIG gave up its rights to the Whitney Canyon reserves, Natural did, in fact, acquire the gas.

---

**10.** The district court did not ask the jury to award damages separately for breach of Section 2 of the Service Agreement and breach of the contractual obligation of good faith and fair dealing. This is troubling because we cannot determine what damages, if any, the jury intended to award for each breach.

Further, the jury incorrectly found that Natural breached its obligation to purchase gas under Section 2 of the Service Agreement. Having found that Natural deliberately breached the Service Agreement by deciding not to purchase gas, it is difficult to see how the jury could objectively consider the question of whether Natural acted in good faith.

Thus, even if we were to find that the bad faith claim was not preempted, we would have to order a new trial. First, the jury would have to evaluate CIG's bad faith claim in light of the fact that Natural did not breach Section 2 of the Service Agreement. Second, even if the jury

still found that Natural breached its contractual obligation of good faith and fair dealing, it would have to determine the appropriate damages for this breach.

**11.** Significantly, one seller challenged FERC's decision alleging that if buyers were permitted to sue based upon a seller's negligent or willful misconduct, some state courts might conclude that actions for "breach of a good faith duty" were *not* preempted. *United Gas Pipe Line*, 824 F.2d at 428. The Fifth Circuit rejected the suggestion that state courts could interpret FERC orders which allowed actions based upon negligence to permit actions for "breach of a good faith duty." Thus, at least one other court has interpreted FERC orders prohibiting suits based upon breach of contract to also forbid suits based upon breach of the contractual obligation of good faith and fair dealing.

Natural argues that the jury's verdict, awarding damages for tortious conduct, must be reversed because CIG's claim is preempted by FERC's modification of the minimum purchase provisions. Natural also asserts that because the Service Agreement allowed it to stop purchasing gas, it may not be held liable for tortious interference based on that conduct. We disagree.

■ FERC's modification of the contract remedy for failure to purchase gas does not limit CIG's right to seek damages for tortious interference with contract. As noted above, in an analogous situation, FERC decided that although it eliminated a gas seller's *contractual* liability for failure to sell gas to curtailed customers, buyers who did not receive contractually agreed upon volumes of gas could maintain suits based upon a seller's *negligent or willful misconduct. United Gas Pipe Line*, 824 F.2d at 430. By not contesting tortious interference damages, FERC apparently made the same distinction in this case. Although *Kalo Brick & Tile* requires preemption of tort actions which conflict with agency orders, 450 U.S. at 326–27, 101 S.Ct. at 1134–35, we decline to find preemption where FERC currently perceives no conflict.

■ More difficult to evaluate is Natural's assertion that its contractual right to choose between purchasing gas or paying CIG for gas not purchased immunized it from a tortious interference claim based upon failure to purchase. There is some support for the proposition that conduct which is otherwise lawful ought not form the basis of a tortious interference claim simply because the alleged tort-feasor is motivated by a desire to interfere with the plaintiff's contractual relations. *See Circo v. Spanish Gardens Food Mfg. Co.*, 643

F.Supp. 51, 56 (W.D.Mo.1985); Perlman, *Interference with Contract and Other Economic Expectancies: A Clash of Tort and Contract Doctrine*, 49 U.Chi.L.Rev. 61, 128 (1982). Advocates of this position are reluctant to impose limitations on conduct which is otherwise permitted in an economy based upon vigorous competition. Perlman, *supra* at 78.

While we are sympathetic to this view and recognize that the law of tortious interference is evolving, *see Restatement (Second) of Torts*, ch. 37, introductory note at 5 (1977), we believe that the better position is that taken by the Restatement and followed by many courts. This line of authority holds that motive can be a determinative factor in converting otherwise lawful behavior into "improper" conduct for which the defendant will be liable. *Restatement (Second) of Torts* § 767 comment d (1977); *Alyeska Pipeline Serv. Co. v. Aurora Air Serv., Inc.*, 604 P.2d 1090, 1093 (Alaska 1979); *see also* Perlman, *Interference with Contract*, 49 U.Chi.L.Rev. 61, 78 (1982). Indeed, Professor Prosser has described the contours of the tort stating that "no specific conduct is prohibited ... and liability turns on the purpose for which the defendant acts." W. Prosser, *Law of Torts* § 129, at 979 (5th ed. 1984).

Natural's interest in being free to adjust its purchases of gas is not so strong that it cannot be limited by a requirement not to exercise its discretion for the purpose of interfering with CIG's contractual relationships. *Alyeska Pipeline*, 604 P.2d at 1093 (right to terminate contract at will did not prevent liability for tortious interference based upon termination of that contract). The tortious interference verdict will stand.[12]

### III. *CIG's Antitrust Claim*

CIG claims that in addition to being a violation of the Service Agreement and a

---

**12.** Natural also asserts the award of $8,000,839 in restitutionary damages was inappropriate. It argues that restitutionary damages are unavailable for tortious interference claims under Section 766A of the Restatement. While it cites one case to this effect, *Marcus, Stowell & Beye Gov't Secs., Inc. v. Jefferson Inv. Corp.*, 797 F.2d 227, 231–32 (5th Cir.1986), the weight of authority holds that restitutionary damages are available

for tortious interference with contract. *See Zippertubing Co. v. Teleflex, Inc.*, 757 F.2d 1401, 1411–12 (3d Cir.1985); *Federal Sugar Ref. Co. v. United States Sugar Equalization Bd.*, 268 F. 575, 582 (D.C.N.Y.1920); *National Merchandising Corp. v. Leyden*, 370 Mass. 425, 348 N.E.2d 771, 775–76 (1976); D. Dobbs, *Remedies* § 6, at 465 (1973).

means of stealing CIG's customers, Natural's decision to stop purchasing gas was also the cornerstone of an attempt by Natural to monopolize the market for the long distance transportation of natural gas.[13] Since an attempt to monopolize typically involves an attempt by a firm which does not possess monopolistic control over a market to become a monopolist in that market, CIG's claim is unusual because it does not allege that Natural was attempting to gain control of the transportation market for itself. Rather, CIG alleges Natural stopped purchasing gas in order to give CIG's chief competitor, the Trailblazer System[14], a monopoly in the long distance gas transportation market.

Natural asserts that a party may not be held liable for attempting to give monopoly power to another party which it does not control. This is especially true, it asserts, when the intended beneficiary of the monopolist is not a single entity but three separately operated entities owned in sig-nificant part by the alleged victim of the monopolistic scheme.

Nevertheless, Section 2 of the Sherman Act does not explicitly state that a party can only monopolize for itself. We need not decide this thorny issue because even if we assume that it is possible to create a monopoly for the benefit of a third party, CIG did not establish each of the elements of an attempted monopolization claim.[15]

CIG alleges that Natural attempted to monopolize the market by preventing CIG from offering gas transportation services to customers who might choose between CIG and the Trailblazer System. Because CIG was required to maintain capacity in its pipeline for the volume of gas Natural chose to reserve under the Service Agreement, CIG was not able to replace lost income from Natural's reduced purchases by offering "firm"[16] transportation services to new customers. In the summer of 1984, after Natural had stopped taking gas

13. Natural also asserted an antitrust counterclaim against CIG. Natural alleged that CIG monopolized or attempted to monopolize the purchase of Wyoming natural gas by intervening and threatening to intervene in FERC proceedings in which CIG's competitors proposed building new pipelines leading out of Wyoming. The district court ruled that the *Noerr–Pennington* doctrine barred evidence of CIG's activities before FERC.

The *Noerr–Pennington* doctrine requires that attempts to influence the government, including attempts to influence administrative agencies, be exempt from attack under the Sherman Act. *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 511–12, 92 S.Ct. 609, 612–13, 30 L.Ed.2d 642 (1972); *Bright v. Moss Ambulance Serv., Inc.*, 824 F.2d 819 (10th Cir.1987). We agree with the district court that nothing in CIG's activities before FERC so corrupts the judicial or administrative process that those activities amount to a sham and therefore are exempt from the *Noerr–Pennington* doctrine. *Hydro–Tech Corp. v. Sundstrand Corp.*, 673 F.2d 1171, 1176–77 & n. 7 (10th Cir.1982).

14. It is important to distinguish between NGPL–Trailblazer, one of the defendants, and the Trailblazer System. The Trailblazer System is a series of three separately owned and operated pipelines joined end-to-end which stretches from Wyoming to Nebraska. When built in 1982, the Trailblazer System greatly expanded the capacity of producers to move their gas from Wyoming to eastern markets. The westernmost segment of the Trailblazer System, Overthrust, is

owned by CIG and Natural, as well as four other companies. The middle segment, WIC, is owned by CIG alone. The easternmost and longest segment of the system, Trailblazer, is owned jointly by NGPL–Trailblazer and two other companies. The Trailblazer System, the alleged beneficiary of Natural's predatory conduct, is not even a party to this case.

15. The difficulty with punishing a firm for attempting to create a monopoly for a third party which does not act as a single entity, is that the threat to competition after the monopoly is achieved is obscure. In a more typical case in which a firm is attempting, through unfair means, to gain control of a market for itself, one can be quite certain the firm will not hesitate to exercise its newly acquired monopoly power. In this case, the alleged monopolist's (Natural's) conduct says little about its *intended beneficiary's* (the Trailblazer System's) proclivity or ability to monopolize. Section 2 of the Sherman Act does not punish the mere possession of monopoly power. *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 62, 31 S.Ct. 502, 516, 55 L.Ed. 619 (1911).

16. Gas can be sold on either a firm or interruptible basis. Firm sales guarantee the purchaser that he will receive the volumes of gas he reserves, while interruptible sales only guarantee deliveries if customers with higher priority do not demand the gas. Since CIG had a firm obligation to sell gas to Natural, CIG could only offer to sell interruptible service to new customers.

from CIG, CIG offered Natural the opportunity to reduce the capacity it reserved on the CIG system. Instead of reducing its reservation, Natural chose to increase it. Thus, Natural continued to tie up CIG's capacity, while refusing to purchase gas.

Further, CIG attempted to offer interruptible service to new customers to utilize the capacity left vacant by Natural's decreased purchases. Soon after CIG began to service the new customers, Natural resumed purchases of gas, forcing CIG to interrupt its service to the new customers. Because the Trailblazer System could offer inexpensive, uninterrupted service, CIG's new customers switched to the Trailblazer System.

While Natural's alleged manipulation of its gas purchases in an effort to disrupt CIG's ability to service new customers may be reprehensible conduct, the antitrust laws cannot be invoked to punish all forms of unseemly business activity. If a party does not have monopolistic control over a market, its unfair business conduct implicates the attempt provision of the antitrust laws only if that conduct threatens to create a monopoly. *Indiana Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir.1989); *cf. Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 54, 97 S.Ct. 2549, 2559, 53 L.Ed.2d 568 (1977) ("an antitrust policy divorced from market considerations would lack any objective benchmarks"). The defendant need face the added sanction of antitrust triple damages only if the plaintiff can establish each element of an antitrust offense.

■ In this circuit, four elements must be proven to establish an attempt to monopolize under Section 2 of the Sherman Act: (1) relevant market (including geographic market and relevant product market) in which the alleged attempt occurred; (2) dangerous probability of success in monopolizing the relevant market; (3) specific intent to monopolize; and (4) conduct in furtherance of such an attempt. *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies*, 783 F.2d 159, 161 (10th Cir.1986). In addition, any private plaintiff seeking treble damages under Section 4 of the Clayton Act must show antitrust injury. *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701, *cert. denied*, 429 U.S. 1090, 97 S.Ct. 1099, 51 L.Ed.2d 535 (1977). While Natural argues that CIG has failed to establish each element of the attempted monopolization claim, CIG's failure to show a dangerous probability of successful monopolization reveals the fundamental difficulty in CIG's claim.[17]

■ In order to satisfy the dangerous probability of success element of an attempt claim, the plaintiff must show that there was a dangerous probability the defendant would achieve monopoly status as the result of the predatory conduct alleged by the plaintiff. *Shoppin' Bag*, 783 F.2d

**17.** Several commentators have noted approvingly that the dangerous probability of success element of the attempt to monopolize offense prevents courts from expanding the Sherman Act into a broad unfair competition statute. For instance, Handler & Steuer state:

[T]here is ample reason for excluding single-firm behavior from the serious penalties of the antitrust laws when no dangerous probability of monopolization exists. When one firm monopolizes an economically significant market or threatens such a monopoly, competition is immediately and seriously jeopardized. It was largely to combat this peril that section 2 of the Sherman Act was passed, fortified with the formidable deterrent of treble damages and criminal penalties. Short of this situation, however, single firm behavior does not present so significant a threat to competition as to warrant such harsh consequences.

Handler & Steuer, *Attempts to Monopolize and No Fault Monopolization*, 129 U.Pa.L.Rev. 125, 175 (1980) (footnote omitted); *see also* 3 P. Areeda & D. Turner, *Antitrust Law* ¶ 833 (1978) (hereinafter Areeda & Turner); *cf.* Cooper, *Attempts and Monopolization: A Mildly Expansionary Answer to the Prophylactic Riddle of Section Two*, 72 Mich.L.Rev. 373, 454–55 (1974) (warning against expansion of the attempt provision into an unfair competition statute); *but see* Blecher, *Attempt to Monopolize Under Section 2 of the Sherman Act: "Dangerous Probability" of Monopolization Within the "Relevant Market,"* 38 Geo.Wash.L.Rev. 215, 222 (1969); Note, *Attempt to Monopolize Under the Sherman Act: Defendant's Market Power as a Requisite to a Prima Facie Case*, 73 Colum.L.Rev. 1451, 1459–61 (1973).

at 162; *Lektro–Vend Corp. v. Vendo Co.,* 660 F.2d 255, 271 (7th Cir.1981), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). The likelihood of successful monopolization is typically evaluated by examining the defendant's share of the relevant market. *Shoppin' Bag,* 783 F.2d at 161. Reformulated in terms of market share, the plaintiff must show that there was a dangerous probability that the defendant's conduct would propel it from a non-monopolistic share of the market to a share that would be large enough to constitute a monopoly for purposes of the monopolization offense.[18] The higher the firm's initial market share, the greater the likelihood that it will eventually gain monopolistic control over the market. *Id.* at 162.

■ CIG asserts the fact that the Trailblazer System's market share rose from 41% to 53% is sufficient evidence to support the jury's finding that there was a dangerous probability that the Trailblazer System would attain a monopoly. If this were a typical attempted monopolization case in which the defendant was attempting to acquire a monopoly for itself through the use of economic coercion, we would have little difficulty in affirming the jury's finding of dangerous probability. First, a market share at the commencement of the defendant's predatory conduct of 41% would show that the defendant would not have to acquire much additional market share in order to attain monopoly control over the market.

More importantly, however, a 41% market share typically indicates that a firm has substantial economic power in the market, and, therefore, has the tools at its disposal to elevate its market share to monopolistic levels. In other words, a high market share indicates that the defendant has the economic capacity to monopolize the market. *Id.* However, proximity to monopolistic status is not enough; the defendant must also have the ability to propel itself to monopolistic control over the market. *Indiana Grocery, Inc., v. Super Valu Stores, Inc.,* 864 F.2d 1409 (7th Cir.1989) (50% market share insufficient to show dangerous probability of successful monopolization); *Richter Concrete Corp. v. Hilltop Concrete Corp.,* 691 F.2d 818, 827 (6th Cir.1982) ("the real test is whether [the defendant] possessed sufficient market power to achieve its aims"); *United States v. Empire Gas Corp.,* 537 F.2d 296, 305 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (50% market share insufficient to show dangerous probability of successful monopolization). While the *Trailblazer System's* substantial market share demonstrates its *proximity* to monopoly status, it does not indicate *Natural's capacity* to raise the Trailblazer System's market share to a monopolistic level.

CIG did not attempt to offer evidence of Natural's share of the transportation market. One might initially imagine that evidence of a firm's market share would be required in order to assess that firm's ability to obtain or confer market power, but this is not necessarily true. In this case, Natural's capacity to create a monopoly for the Trailblazer System cannot be measured by Natural's market share because Natural did not use economic coercion in its attempt to monopolize. Rather, Natural took advantage of its contractual right to stop purchasing gas from CIG to magnify the Trailblazer System's position in the market.[19] In evaluating the probability of successful monopolization "we must consider the firm's capacity to commit the offense, the scope of its objective, and the character of its conduct." *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579, 598 (7th Cir.1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).

**18.** While the Supreme Court has refused to specify a minimum market share necessary to indicate a defendant has monopoly power, lower courts generally require a minimum market share of between 70% and 80%. 2 E. Kintner, *Federal Antitrust Law* § 12.6 (1980); Areeda & Turner, ¶ 803.

**19.** The record does not clearly disclose how much of the Trailblazer System's market share gain reflected increased transportation volumes because CIG was unavailable as a competitor, and how much the market share gain simply resulted from the Trailblazer System's constant sales level in comparison with CIG's sales losses.

In this case each of these factors is strictly determined and ultimately limited by the Service Agreement between Natural and CIG.

Natural's predatory conduct consisted of exercising its contract rights with CIG to prevent CIG from offering transportation services to long distance customers. Because Natural reserved a certain amount of space in CIG's pipeline, CIG could not offer that space to others. By continuing to reserve large amounts of gas and taking gas when CIG threatened to sell Natural's reserved capacity, Natural insured that CIG could not offer Natural's reserved capacity to the market. Yet, Natural's ability to exclude CIG was strictly limited by Natural's ability to insure its reserved capacity went empty. By exercising *all* its rights under the Service Agreement to tie up the *entire* capacity it had reserved, Natural was still only able to raise the Trailblazer System's market share to 54%.

Thus, *from the beginning,* Natural's decision to quit purchasing gas presented no danger that Natural could do anything more than shift 13% of the market to the Trailblazer System. The necessarily limited scope of Natural's objective leaves no room for speculation about the probability that the Trailblazer System would gain a monopoly. There was simply no reasonable chance, let alone a dangerous probability, that Natural, through the exercise of its contractual rights, could imbue the Trailblazer System with sufficient market share to be a monopolist.[20]

Further, market share statistics sometimes overestimate a firm's market power. *See, e.g., Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.,* 784 F.2d 1325, 1335 (7th Cir.1986); Landes & Posner, *Market Power in Antitrust Cases,* 94 Harv.L. Rev. 937, 950 (1981). In this case, if we look beyond market share statistics, we are further convinced that Natural's conduct did not threaten to give the Trailblazer System the degree of market power that would constitute a monopoly for purposes of the monopolization offense. One measure of the degree of market power is the persistence of a firm's ability to profitably charge monopoly prices.[21] If the evidence

---

**20.** We agree with the proposition that it is no defense to an attempted monopolization charge that the defendant's attempt to monopolize proved to be unsuccessful. *United States v. American Airlines, Inc.,* 743 F.2d 1114, 1119 (5th Cir.1984). Simply because a plan fails to succeed does not mean there was no probability that it could have succeeded. A flipped coin which lands heads still had a 50% chance of landing tails before it was flipped. The capacity of the defendant to monopolize must be evaluated at the commencement of the predatory scheme.

We also note our holding in this case does not require that in every instance where a party intends to eliminate a competitor through unfair means, the elimination of the competitor must give the predator a monopolistic market share. For instance, when a party with a substantial market share eliminates a smaller competitor through economic coercion, increased market power will give it even greater coercive power to eliminate other competitors. There is no reason to wait until the predator attacks a competitor that would put it just over the brink of monopolization before it can be stopped. *See* Note, *Attempt to Monopolize Under The Sherman Act: Defendants Market Power as a Requisite to a Prima Facie Case,* 73 Colum.L.Rev. 1451, 1462–63 (1973).

In this case, Natural sought to take advantage of a unique opportunity its contract afforded to temporarily harm a competitor of an entity in which it had an economic stake. Unlike the ordinary situation in which a firm's market share is crucial to the firm's ability to engage in predatory conduct and every predatory act makes future predation easier, Natural's ability to engage in predatory conduct would not be enhanced by conferring market share upon the Trailblazer System.

**21.** Although most courts do not explicitly discuss the persistence of a firm's ability to charge supracompetitive prices as a measure of a firm's market power, courts indirectly consider the potential longevity of supracompetitive pricing whenever they use market share to evaluate the degree of market power. Market share statistics are a useful measure of market power, in large part, because they indicate the relative durability of supracompetitive pricing capacity. The greater a firm's market share, the longer it will be able to charge monopoly prices because it will take longer for its small competitors to increase their output enough to discipline prices. *See* H. Hovencamp, *Economics and Federal Antitrust Law* § 3.1, at 58 (1985).

The durability of a firm's ability to charge supracompetitive prices also underlies another factor used to evaluate the degree of market power. Barriers to entry are often used by courts to determine whether an alleged monopolist has sufficient market power for purposes

demonstrates that a firm's ability to charge monopoly prices will necessarily be temporary, the firm will not possess the degree of market power required for the monopolization offense.[22] 3 P. Areeda & D. Turner, *Antitrust Law*, at ¶ 807; *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 252 (D.C.Cir.1987); *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 530 (5th Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983); *Metro Mobile CTS, Inc. v. Newvector Communications, Inc.*, 661 F.Supp. 1504, 1523–24 (1987); *cf. Cop-* perweld v. Independence Tube Corp., 467 U.S. 752, 767–68, 104 S.Ct. 2731, 2739–40, 81 L.Ed.2d 628 (1984) (antitrust laws are only meant to condemn conduct with long-run anticompetitive effects).[23]

In this case, the Trailblazer System's ability to charge supracompetitive prices could last only as long as Natural had the contractual right to tie up CIG's pipeline capacity. This right was strictly limited by the duration of the Service Agreement.[24] Once Natural's control over CIG's capacity ended, the market would return to the status quo[25] since the Trailblazer System

---

of the monopolization offense. 2 E. Kintner, *Federal Antitrust Law* § 12.9 (1980). Barriers to entry are market characteristics which make it difficult or time-consuming for new firms to enter a market. For instance, if market entry requires the construction of large manufacturing plants, *Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 119, 107 S.Ct. 484, 494, 93 L.Ed.2d 427 (1986), or obtaining governmental approval to enter the market, *United States v. Marine Bancorporation, Inc.*, 418 U.S. 602, 628–29, 94 S.Ct. 2856, 2873–74, 41 L.Ed.2d 978 (1974), the market is said to have high barriers to entry. Often courts refuse to find a sufficient degree of market power for the monopolization offense when they determine that a market has low barriers to entry. *See, e.g., Ball Memorial Hosp.*, 784 F.2d at 1335. While a firm may have the capacity to charge supracompetitive prices in a market with low barriers to entry, that capacity is likely to be temporary.

**22.** Some courts and commentators label the degree of market power necessary for the monopolization offense as "monopoly power." *See* L. Sullivan, *Antitrust* § 22, at 75 (1977) ("Monopoly power can be distinguished from a lesser amount of market power only in degree."); *Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 529 (5th Cir.1982), cert. denied, 460 U.S. 1082, 103 S.Ct. 1770, 76 L.Ed.2d 344 (1983). One commentator has suggested that in the future courts might more precisely define monopoly power by "focus[ing] on the *permanence* of market power, with mere market power suggesting that supranormal profits will be *quickly eroded* by new entry, and monopoly power suggesting significantly greater insulation from the *long-run* forces of entry." G. Hay, *Single Firm Conduct*, 57 Antitrust L.J. 75, 81 (1988) (emphasis added). While we do not adopt this commentator's nomenclature, we do agree with his assertion that market power must be persistent to make a firm a monopolist for purposes of the antitrust laws.

**23.** A suggestion that unidentified market forces will eventually correct supracompetitive pricing will not suffice to show that market power will be temporary. Only when an alleged monopolist faces substantial competition from a *known competitor* who will enter the market in a *definite period of time*, ought courts to decline to find sufficient market power to satisfy the requirement for the monopolization offense. *Williamsburg Wax Museum*, 810 F.2d at 252 (defendant did not have monopoly in the wax figure market because a *known competitor* could, within a year, begin to deliver wax figures); *Metro Mobile CTS*, 661 F.Supp. at 1523–24 (defendant did not possess monopoly for purposes of the monopolization or attempted monopolization offense even though it controlled 100% of the market because a known competitor had both the plans and capacity to enter the market within three years). *Cf.* Landes & Posner, *Market Power in Antitrust Cases*, 94 Harv.L.Rev. 937, 950, n. 28 (1981) (difficulty in identifying potential competitors forces courts to assume that a firm's ability to charge monopoly prices will be persistent).

**24.** The Service Agreement was to expire in 1989. Thus, the Trailblazer System would be free from competition for a longer period of time than the defendants in either *Williamsburg Wax Museum* (1 year) or *Metro Mobile CTS* (3 years). Yet, the actual number of years that the Trailblazer System would be free from competition from CIG is not the deciding factor in this case. Rather the certainty that the market will return to the status quo at a predetermined date and the fact that the Trailblazer System has no power to prevent the erosion of its market share, convince us that the market implications of Natural's conduct are not the subject of the antitrust laws.

**25.** There is no suggestion in the record that Natural was in danger of driving CIG completely out of the transportation business before the expiration of the Service Agreement. Indeed, considering CIG's financial resources and record profitability during Natural's tie-up, it is unlikely that Natural could have completely ex-

would be helpless to compete against the unused and inexpensive capacity of CIG's system.

This analysis, which requires a plaintiff to show that an attempted monopolist's conduct[26] threatened to create substantial and persistent changes in the marketplace, may allow some unfair and potentially harmful methods of competition to go unpunished by the antitrust laws. But the Supreme Court, in a now oft quoted phrase, has stated "the antitrust laws ... were enacted for 'the protection of competition not competitors.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)), *cert. denied*, 429 U.S. 1090, 97 S.Ct. 1099, 51 L.Ed.2d 535 (1977). The Court has long recognized that the Sherman Act "does not purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Hunt v. Crumboch*, 325 U.S. 821, 826, 65 S.Ct. 1545, 1548, 89 L.Ed. 1954 (1945). We believe the triple damage sanction of the Clayton Act is too harsh a remedy for unfair methods of competition that only threaten to have a transitory impact on the marketplace. Since there was no dangerous probability that Natural would bestow upon the Trailblazer System the degree of market power, either in terms of market share or persistence, necessary for the monopolization offense, the jury's antitrust verdict must be reversed.

### IV. *Conclusion*

In conclusion, we hold that because FERC has already determined the appropriate contractual rate for failure to purchase

gas, and Natural has paid CIG that rate, the verdicts for breach of contract and bad faith breach of contract awarding a different rate are reversed. The antitrust verdict is reversed because CIG failed to present sufficient evidence for a jury to find a dangerous probability of successful monopolization. The verdict for tortious interference with contract is affirmed.

---

cluded CIG. By attacking CIG, Natural could not alter the competitive structure of the industry which is based on a permanent superstructure. *See Cargill v. Monfort*, 479 U.S. at 119, n. 15, 107 S.Ct. at 494, n. 15.

**26.** One treatise has stressed that courts ought to take a long-run view when evaluating allegedly anticompetitive conduct. In attempting to distinguish between conduct that should be addressed by the antitrust laws and conduct which should be regulated by tort law, Professors Areeda and Turner state:

[M]ost important, is our doubt that the torts and other activities considered in this Paragraph would very often seriously impair the competitive opportunities of rivals in any significant or *permanent* way. We must beware of the inclination to condemn a monopolist on the basis of antisocial behavior that could possibly give him an improper advantage in the market.... The antitrust court must, therefore, insist on ... significant and *more-than-temporary* harmful effects on *competition.*

Areeda & Turner, ¶ 737b (emphasis added).